David F. Lee, Jr., J.
In this proceeding pursuant to the Real Property Tax Law to review a determination of the Board of Assessors, the petitioner, now the Faculty-Student Association of the State University of New York at Binghamton, Inc., seeks the benefit of the tax exemption provided by section 420 of the Real Property Tax Law for qualifying corporations or associations.
The facts have been stipulated to by the parties, and several exhibits submitted in this proceeding. The real property in question consists of approximately 212 acres of land in the Town of Spencer, Tioga County, New York, acquired by the petitioner on September 9, 1965. The “ Stipulation of Facts ” states that the premises “ consist of a partly wooded area on which is situate a small lake, partly natural, which had been enlarged by the erection of a dam. (Note: subject parcel is 36 miles from Harpur College.) Between the date of acquisition and May 1, 1966, the taxable status date, petitioner did the following acts and improvements, more fully set forth at paragraph 44:
(a) Reconstructed the dam
(b) Improved the entrance road
(c) Cleared areas for parking
(d) Drilled a well
(e) Obtained an easement from neighbors to allow power lines to be strung.
*114 The ‘ ‘ Stipulation of Facts ’ ’ further states, in part:
3. Prior to May 1, 1966, the assessors of the Town of Spencer placed an assessed valuation on said premises for tax purposes in the amount of $4,000.
4. On June 21, 1966, being the date for the hearing of complaints with respect to assessments, petitioner appeared before the Board of Assessors and protested said assessment on the ground that the premises are exempt from taxation under Section 420 of the Real Property Tax Law. The basis for this assertion was that petitioner claims to be an educational and charitable corporation and intends to use the premises for educational and charitable purposes. * * *
7. Petitioner is a nonprofit corporation organized under the Membership Corporations Law of the State of New York, originally incorporated August 21, 1950 under the name, Faculty-Student Association of Triple Cities College, Inc., and subsequently consolidated with the Faculty-Student Association of Champlain College, Inc. by certificate of consolidation filed with the Secretary of State June 2, 1953. The name of the consolidated corporation was changed to Faculty-Student Association of Harpur College, Inc. All legal work was effected by State University counsel. On August 30, 1966, petitioner’s name again was changed to the Faculty-Student Association of State University of New York at Binghamton, Inc. to reflect the creation of a university center at Binghamton.
8. The purpose clause of the certificate of incorporation read: “ To promote and cultivate social relations among the students and faculty of Triple Cities College, a unit of the State University of New York, and to aid the students and faculty of such college by assisting them in every way possible in their study, work, living and extra-curricular activities. '* * *
9. Pursuant to section 11, article II of the Membership Corporations Law, consent of the Commissioner of Education was obtained (Education Law, § 216).
10. Section 2 of article I of the Bylaws sets forth the following purposes of the petitioner in conjunction with the certificate of incorporation: “ The purpose of this Association shall be to promote and cultivate educational and social relations among the students and faculty of Triple Cities College, a unit of the State University of New York, hereinafter called the ‘College’, and to aid the students and faculty of the college by assisting them in every possible way in their education and in their study, work, living, and extra-curricular activities incidental thereto. This Association shall be a nonprofit corporaton and any net income which may be derived from any of its operations, in pursuance of the purposes set forth herein shall not inure to the benefit of any member of the Association, but shall be used to promote the educational purposes of the Association or the College.” * * *
14. The University was first comprised of certain existing teachers’ colleges, the adoption of certain existing extension schools, and certain State Technical Institutes. The over-all university control was vested in and continues to remain in the State University Board of Trustees. The President of the State University is responsible to the Trustees. Each constituent unit of the State University has its own council, akin to a Board of Trustees for each unit, and its own President. Thus, each constituent unit is a separate educational entity within the total university framework. At the creation of the State University nearly 30,000 students in over twenty-five (25) separate institutions became students of the State University of New York. * * *
18. An internal organization for each unit appeared to be needed to meet the demands created by a far-flung university concept composed of over twenty-five (25) separate campuses. The immediate need for the creation of petitioner was caused by the lack of a practical vehicle for the purchase of the bookstore *115 from Syracuse University when the then Triple Cities College joined the State University of New York.
19. 'State University counsel played a dominant role in the creation of the petitioner. The duties of counsel to the University are to “provide legal advice and opinions for the board of trustees and officers of the University on matters concerning University affairs. He shall, when requested by the board of trustees or the chancellor, conduct negotiations and prepare legal documents for the University.” (New York State Official Compilation of Codes, Rules and Regulations, Education Department regulation 328.9) [8 NYCRR 328.9].
20. On August 8, 1950 the counsel for State University set forth the following concept for the creation of petitioner in a letter to the then Provost of Triple Cities College, State University of New York: “ As you will see from the Certificate of Incorporation, the Association will be a nonprofit membership corporation created for the purpose of being of service to the students and faculty of Triple Cities College. It is our intention that this Association should operate those student services and facilities which under restrictive state procedures might be cumbersome. Specifically, we anticipate that the Association would operate the college bookstore, be in charge of competitive athletic events, publish campus newspapers, yearbooks, etc., and perform similar service for the students and faculty.” * * *
24. Bylaws for the petitioner were drawn up by the counsel for the State University of New York. Article II, section 1, of petitioner’s bylaws now shows the association membership to be composed of the following:
(a) Chief Administration Officer (President of College)
(b) Chief Academic Officer (Dean)
(c) Dean of Students
(d) Chief Nonacademic Officer
(e) Associate Dean of Students for Student Activities
(f) 2 Faculty members and 1 Administration member elected by Association
(g) President of Student Government (a student)
(h) Treasurer of Student Government (a student)
(i) Chairman Senior Committee (a student)
(j) Three elected United Student Government Representatives appointed by United Student Government President (students).
25. The board of directors, as set forth in article IV of petitioner’s bylaws, is to be made up of five administration or faculty members and one student currently enrolled at the institution, if legally qualified.
26. The officers of petitioner are elected by the board of directors. The officers are President, Vice-President, Secretary and Treasurer. Traditionally, the President of the College is President of petitioner.
27. None of the members, directors or officers can receive remuneration. (Article V, section 5, petitioner’s bylaws).
28. All books and records of the Association are subject to examination and audit by the State University of New York and the Comptroller of the State of New York pursuant to petitioner’s Bylaws, article VI, section 3.
29. In the event of dissolution, all assets of petitioner are directed to be transferred to a nonprofit organization or organizations the board of directors has deemed qualified and competent to promote the purposes of the college and the educational activities of its faculty and students, such as the Harpur College Foundation. * * *
30. On March 4, 1955, Champlain College, a liberal arts unit, was terminated by State University. Champlain College assets and personal property merged with Harpur College and its staff and students were assigned to Harpur College. *116 Its Faculty-Student Association was consolidated with the Faculty-Student Association of Harpur College with legal work effected by State University Counsel. * * *
31. On August 30, 1966, after commencement of this action, petitioner’s name changed to Faculty Student Association of State University of New York at Binghamton, Inc., which reflected the creation of the State University of New York at Binghamton.
32. On February 8, 1952, petitionei received exemption from Federal income taxes pursuant to section 501 (c) (3) of the Internal Revenue Code, (then section 101(6)), and petitioner continues to be exempt under that provision. * * *
33. On November 7, 1952, the Board of Appeals of the Labor Department determined that petitioner was not subject to the Unemployment Insurance Law, stating: “Examination of the purposes of the organization as set forth in the Certificate of Incorporation reveals that it was organized solely for functions directly connected with the formal education of the students or matters inherently coincidental thereto, such as are universally recognized as part of the training and development of the college student ”.
34. On August 18, 1966, after the taxable status date for the Town of Spencer of May 1, 1966, the purpose clause of petitioner was amended to add the following : “ The general purposes of this Association are educational within the meaning of Sec. 501(e) (3) of the Internal Revenue Code and its regulations, and within this meaning the general purposes shall be to establish, operate, manage, promote, and cultivate educational activities and relationships incidental thereto by, between and among the students and faculty of State University of New York at Binghamton, Inc., and to aid the students, faculty, and administration of the university in the furtherance of their education and studies, work, living, and extra-curricular activities incidental thereto, in collaboration and coordination with the educational goals of the University.”
35. The operations of petitioner fall into four main categories,— A. food services; B. college bookstore C. supervision of student activities, and D. miscellaneous activities. * * *
D. Miscellaneous activities
1. Laundry and linen service.
a) Petitioner provides laundry and linens to students in dormitories on a rental basis and pays students who are responsible for these activities.
2. Petitioner provides transportation for all intercollegiate sports activities and student activities which necessitate transportation. Petitioner leases several automobiles which are used for this express purpose.
3. Petitioner purchases typewriters for faculty and administration where state funds are not available.
4. Petitioner has purchased recreational equipment for dormitory lounges and student activities. This equipment includes ping pong sets, games, pool tables, bowling equipment, ski equipment, and like equipment.
5. Petitioner advances moneys for graduation and diploma fees and collects these fees from the students.
6. Petitioner had advanced moneys to faculty members where travel advances are not available.
7. Petitioner maintains a Student Loan Fund where students receive loans when in dire financial circumstances. These loans are without interest.
8. Petitioner has established an account to handle Guarneri Quartet moneys. The Guarneri Quartet is a musical organization in residence at the University which has received critical acclaim and which performs its concerts to capacity *117 audiences at the college. From this budget, Faculty-Student Association has purchased certain equipment for the Quartet.
* * *
38. Revenues from the cafeterias, bookstore and other services are used to make up the administrative account and include reserves for equipment and other matters set forth at paragraph 35.
39. Revenue also is obtained from the Student Activities fees. These fees are utilized by a budget established by students through the Student Government. * * *
42. The purchase of the real property in question, now known by petitioner as the Lake Empire Campus, arose from petitioner’s belief that the college was in need of an area for study of various academic pursuits, such as geology and botany, for athletic programs connected with its physical education courses, such as canoeing, boating, skiing, skating and swimming; for seminars; for picnics and recreation, and for orientation, in an informal atmosphere, of freshmen to college living. Petitioner was further of the opinion that existing recreational areas near the college were inadequate and were strained because of the expansion of the college.
43. A committee of faculty students and administration created by petitioner had studied various properties for petitioner, and recommended purchase of the subject property. Prior to purchase petitioner obtained reports from its faculty as to use for academic purposes.
On May 31, 1965, Geology Professor Donald R. Coates, Ph.D., wrote: “ There are two areas that are sufficiently flat that, with minimal construction, could serve as recreational fields: * * * The Department of Biology has indicated'
that such a site would serve for various exercises and projects in a variety of courses (I can attest to the high chigger population). Limnology studies could be performed by impoundment of upper Dachman swamp thus permitting lake evolution studies of two water bodies, one under natural conditions, the other under influence of man occupancy. The area could serve as a climatology laboratory for the Department of Geography with special emphasis on microclimates. The Department of Geology is especially interested in establishing a hydrology model study and the terrain is admirably suited for such purposes.”
44. In addition to the improvements noted in paragraph 2 hereof and fully set forth here, the petitioner, prior to May 1, 1966, took the following steps with respect to the real property in question:
a) Contracted to obtain an aerial and land survey.
b) Contracted with an architect for the development of toilet facilities, seminar areas and plans for first-aid room.
c) Obtained recommendations of educational uses of the property from members of the Harpur College Faculty * * *. These include:
1. A memorandum dated May 31, 1966 by David C. Henderson, Ph.D., Chairman of the Physical Education Department, who wrote: “ It is the intention of the department to offer courses which in part will satisfy the requirement in physical education, at Empire Lake as soon as facilities and equipment are available. Such activities as: boating and canoeing, sailing (sunfish and dinghy), hiking, and scuba field trips will be included in the program.”
2. A memorandum dated June 1, 1966 by George J. Schumacher, Ph.D., Chairman of the Department of Biology, who wrote: “In reviewing the Empire
Lake area, it seems to me that the Biology Department could use this facility in a variety of ways. Its primary use to us would be for field trips by students involved in Biology 134 — Field Botany, Biology 136 — Natural History of *118 Vertebrates, Biology 234 — • Morphology of Vascular Plants, Biology 274— Ecology, Biology 275 — Cryptogamie Botany, and Biology 312 — Limnology. In addition to these, I believe the area would be ideally suited for certain students in our Independent Work program (Biology 175 and Biology 349). Because of the nature of the area,. I do not visualize that it will be used by graduate students for thesis study or by faculty members for intensive research; but due to the variety of habitats, both aquatic and terrestrial, it will prove to be of use in the courses listed above. Its close proximity to the campus will permit individuals or classes to visit the Lake, spend time studying and collecting, and return to school within any given morning or afternoon.”'
The petitioner alleges:
9. Upon information and belief, the assessment of said property so made as aforesaid by the assessors on said assessment rolls, is illegal and unjust for the reason that petitioner is a nonprofit, membership corporation organized for educational purposes, and therefore is a corporation whose real property is exempted from assessment by section 420, subdivision'1 of the Real Property Tax Law of the State of New York.
10. Further, that the said assessment is illegal for the reason that petitioner is a nonprofit, membership corporation organized for charitable purposes and therefore is a corporation whose real property is exempt from taxation by section 420, subdivision 1 of the Real Property Tax Law of the State of New York.
The respondents’ answer alleges:
11. That the certificate of incorporation of the Faculty-Student Association of Harpur College, Inc., as it read on June 21, 1966, stated the purpose of said corporation to be “ To promote and cultivate social relations among the students and faculty of Triple Cities College, a unit of the State University of New York, and to aid the students and faculty of such college by assisting them in every way possible in their study, work, living and extracurricular activities.”
12. That on the face of the aforesaid statement of purpose the corporation was not organized exclusively for educational or charitable purposes as required by the provisions of section 420, subdivision 1, of the Real Property Tax Law, but was primarily to promote and cultivate social relations among students and faculty of the College, and among other things to aid said students and faculty in their living and extracurricular activities.
AS A SECOND COMPLETE DEFENSE TO THE PRAYER OF SAID PETITION THE RESPONDENTS ALLEGE:
13. That to the observation of the respondents and on information and belief, the petitioner as of June 21, 1966, the date when the petitioner appeared before the Board of Review and protested the aforesaid assessment, petitioner had made no use of said premises for any educational or charitable purpose or for any other purpose and had made no improvements to the premises with the possible exception of some work on the dam which impounds the waters of the lake on said premises.
The second defense alleged, paragraph 13, of course raises a question as to whether the non-income-producing property which is not in “ actual use ” for educational or charitable purposes may qualify for exemption. Subdivision 3 of section 420 provides that non-income-producing property, as the property in question is, shall nevertheless qualify for exemption if the con *119 struction of such facilities “is in progress or is in good faith contemplated ”, The court concludes and finds that construction of “suitable buildings” and “improvements” on the premises is in good faith contemplated by petitioner.
The test for determining the taxable status of educational property is succinctly pointed out in an article entitled “ Tax Exemption of Educational Property in New York ” (52 Cornell L. Q. 551, 552 [1967], by Professor W. David Curtiss, who states, after quoting section 420 of the Beal Property Tax Law, that: “ Section 420 thus establishes the test for determining the taxable status of educational property in the state. To qualify for exemption, the property must: (1) be owned by a corporation or association organized exclusively for educational purposes, and (2) be used exclusively for carrying out such purposes. In addition, property which yields ‘ pecuniary profit,’ as contrasted with ‘ reasonable compensation ’ for services rendered, to any member or employee of the corporate owner is precluded from exemption.”
The basic question for determination in this proceeding is whether petitioner, the owner of the real property, is a corporation “ organized exclusively ” for education or charitable purposes. If it is not, then there can be no exemption. ‘1 In order to be entitled to tax exemption, it would appear that the plaintiff must bring itself within the statutory class upon its own merits and not in reliance upon the functions of the * * * College. Since the college itself does not own or control the property in question, its functions cannot place a cloak of tax immunity over the plaintiff.” (Plattsburgh State Teachers Coll. Assn. v. Barnard, 9 Misc 2d 897, 901.)
The petitioner’s certificate of incorporation states: “ 2. The purposes for which it is to be formed are to promote and cultivate social relations among the students and faculty of Triple Cities College, a unit of the State University of New York, and to aid the students and faculty of such college by assisting them in every way possible in their study, work, living and extracurricular activities. ’ ’
The by-laws of petitioner, set forth in paragraph 10 of ‘ ‘ Stipulation of Pacts ’ ’ provide, in part: ‘1 The purpose of this Association shall be to promote and cultivate educational and social relations among the students and faculty”.
In determining whether petitioner has met the statutory test, the ‘ ‘ exclusivity test ’ ’ or the ‘ ‘ organized exclusively ’ ’ requirement, should a strict, literal and narrow construction or interpretation be given to the words ‘ ‘ to promote and cultivate social relations among the students and faculty” found in the *120 certificate of incorporation as it read on June 21,1966, or should the actual over-all purpose, the declared purpose of the association as set forth in the remaining portion of the purposes clause or paragraph of the certificate of incorporation and in the by-laws and evidenced by the activities of the association to which it restricts itself, also be considered? As the court stated in National Navy Club of N. Y. v. City of New York (122 Misc. 89, 93): ” The fair construction of these clauses is indicated by the manner in which plaintiff has proceeded to carry out the objects they express.”
The use of the term ‘ ‘ educational ’ ’ in the statute, and the words ‘1 education ’ ’ and 1 ‘ educational ’ ’ have been discussed at considerable length in many decisions and opinions. It has often been stated that ‘ ‘ education is a broad and comprehensive term ”, and the word “ educational ” as used in the statute must be taken in its broad sense. “ The term education ‘ contemplates not only the mental and moral but the physical training and welfare. ’ (Matter of Syracuse University [214 App. Div. 375] People ex rel. Trustees v. Metzger, 98 App. Div, 237, at p. 239; affd., 181 N. Y. 511; Matter of Moses, 138 App. Div. 525, at p. 528; Matter of Field, 71 Misc. 396, at p. 397; affd., 147 App. Div. 927; Mt. Hermon Boys’ School v. Gill, 145 Mass. 139; 13 N. E. 354.) Education may be particularly directed to either the mental, moral or physical powers and faculties but in its broadest and best sense it relates to them all. (Black Law Dict. [3d ed.] p. 642.) ” (Matter of Buffalo Turn Verein v. Reuling, 155 Misc. 797, 799, affd. 257 App. Div. 902.)
In Essenfeld Bros. v. Hostetter (14 N Y 2d 47, 52), in considering certain specific language of the Alcoholic Beverage Control Law, the court said: ‘ ‘ This is sweeping language but, as this court wrote some years ago in construing the latter subdivision, 1 In the interpretation of statutes, the spirit and purpose of the act and the objects to be accomplished must be considered- * * * Literal meanings of words are not to be adhered to or suffered to ‘ ‘ defeat the general purpose and manifest policy intended to be promoted’”. (People v. Ryan, 274 N. Y. 149, 152.)
‘ There is no more likely way to misapprehend the meaning of language — be it in a constitution, a statute, a will or a contract ’, Judge Learned Hand has reminded us, ‘ than to read the words literally, forgetting the object which the document as a whole is meant to secure. ’ (Central Hanover Bank & Trust Co. v. Commissioner of Int. Revenue, 159 F. 2d 167, 169; see, also, Spencer v. Childs, 1 N Y 2d 103, 106-107; Cabell v. Markham, 148 F. 2d 737, 739.) ’’(Quoted in Matter of Village of Gowanda v. County of Erie, 25 A D 2d 18.)
*121 In People ex rel. Watchtower Bible & Tract Soc. v. Haring (8 N Y 2d 350, 358) Chief Judge Desmond writing for the court said, with reference to construction of the exemption statute:
11 While an exemption statute is to be construed strictly against those argtling for nontaxability (People ex rel. Mizpah Lodge v. Burke, 228 N. Y. 245), the interpretation should not he so narrow and literal as to defeat its settled purpose, which in this instance is that of encouraging, fostering and protecting religious and educational institutions. ’ ’
. In the Watchtower case (supra), the court quotes from People ex rel. Seminary of Our Lady of Angels v. Barber (42 Hun 27 [1886], affd., 106 N. Y. 669) and points out at page 357, concerning the policy of the law and construction of the statute:
‘ ‘ The court refused to accept so strict a construction and, holding (42 Hun, supra, p. 30) that the statute was ‘ entitled to such a construction as will permit it to serve the purposes in view ’, ruled that in order to be entitled to exemption the land need only he devoted to no use other than that which is necessary or fairly incident to the uses and purposes of the institution. * * # As the General Term said in the Seminary case (42 Hun 26, 30): 1 The policy of the law has been, in this State from an early day, to encourage, foster and protect corporate institutions of religious and literary character, because the religious, moral and intellectual culture afforded by them were deemed, as they are in fact, beneficial to the public, necessary to the advancement of civilization, and the promotion of the welfare of society. And, therefore, those institutions have been relieved from the burden of taxation by statutory exemption. ’ ”
The court is mindful of the conflict between the policy of having all realty hear an equal share of the cost of public services and the policy of encouraging and fostering certain corporations and associations which are considered to bestow on the public a greater benefit, the advancement of man’s knowledge, as well as the pressing need for tax money. The court is also aware that the petitioner has the burden of establishing that it is so organized and conducted as to justify the granting of this exemption, and the court should not construe the statute or the certificate of incorporation so literally as to defeat the established purpose of fostering education.
The court concludes and finds upon the stipulated facts and the exhibits submitted that the petitioner was organized exclusively for educational and for charitable purposes and that its teal property in the Town of Spencer is used exclusively for such purposes within the meaning and intent of the statute and is therefore exempt from taxation. (See Matter of Pace Coll. *122 v. Boyland, 4 N Y 2d 528; People ex rel. Watchtower Bible & Tract Soc. v. Haring, 8 NY 2d 350, mot. for rearg. den. 9 N Y 2d 638, supra; People ex rel. Seminary of Our Lady of Angels v. Barber, 42 Hun 27, affd. 106 N. Y. 669, supra; Matter of De Peyster, 210 N. Y. 216; People ex rel. Untermyer v. McGregor, 295 N. Y. 237; People ex rel. Doctors Hosp. v. Sexton, 267 App. Div. 736, affd. 295 N. Y. 553; Matter of Syracuse Univ., 214 App. Div. 375; Matter of Associated YM-YWHA’s v. D’Angelo, 38 Misc 2d 1082; Matter of Little Theatre v. Hoyt, 7 Misc 2d 907, affd. 4 A D 2d 853; 52 Cornell L. Q. 551 [1967], and cases cited.)