Matthew J. Jasen, J.
Pursuant to CPLR 3212, defendants move for summary judgment against the plaintiffs upon the ground that there are no triable issues of fact and also that, as a matter of law, there is no merit to the cause of action alleged in the complaint.
The defendants are all past or present members of the State University of New York Board of Trustees, except Richard A. Siggelkow, who is Dean of Students at Buffalo.
The plaintiffs are six nationally affiliated fraternal organizations which seek a judgment declaring a resolution of the Board of Trustees of State University of New York invalid insofar as it prohibits the existence of local chapters of their organizations at the State University of New York at Buffalo.
The State University of New York was created in 1948 as a corporate instrumentality of the State. Among other things, it was charged with the responsibility for the direct operation and administration of all State institutions of higher educa *1031 tion. (Education Law, § 352; § 355, subd. 1, par. a.) It is governed by a Board of Trustees, which is empowered to make and establish ‘1 rules and regulations, not inconsistent with law, for the government of the state university and the institutions therein.” (Education Law, § 353; § 355, subd. 2, par. b.)
Further, the board is specifically directed “ To regulate the admission of students, prescribe the qualifications for their continued attendance, regulate tuition charges where no provision is otherwise made therefor by law, and regulate other fees and charges, curricula and all other matters pertaining to the operation and administration of each state-operated institution in the state university.” (Education Law, § 355, subd. 2, par. i.)
It appears, that shortly after the creation of State University, problems arose relating to social organizations on its campuses. A study of these problems was ordered by the board and on September 16, 1952, the president was directed to expand his study and to report his findings to the board. It seems that this study continued throughout the Fall of 1952 and up to the Spring of 1953, at which time the president submitted his written report entitled “ The University and Its Student Social Organizations ’ ’ which set forth his findings and recommendations. This report was approved by the board on July 23, 1953. Finally, on October 8, 1953, the board adopted a resolution relating to the social organizations at the University, which provided as follows:
“ resolved, that no social organization shall be permitted in any state-operated unit of the State University which has any direct or indirect affiliation or connection with any national or other organization outside the particular unit; and be it further
‘1 resolved, that no such social organization, in policy or practice, shall operate under any rule which bars students on account of race, color, religion, creed, national origin or other artificial criteria; and be it further
“ resolved, that the President be, and hereby is, authorized to take such steps as he may deem appropriate to implement this policy, including the determination of which student organizations are social, as distinguished from scholastic or religious, and his decision shall be final.”
The University of Buffalo, now the State University of New York at Buffalo, was not a part of the State University in 1953 when the fraternity resolution was adopted. It was not until August 31,1962, that the University of Buffalo was merged into and became one of the State-operated institutions.
*1032 However, during the course of the negotiations leading to said merger, the question was raised as to whether the said 1953 fraternity policy resolution would apply to the University of Buffalo if the merger should be completed.
The Board of Trustees at that time adopted a second resolution on the subject on May 10, 1962, which read:
“ whereas, it is the policy of State University of New York to permit no social organizations which, in policy or practice, bars students on account of race, color, religion, creed, national origin, or any other artificial criteria; and
“ whereas, it is the policy of State University of New York to permit no social organization which has any direct or indirect affiliation or connection with any national or other organization outside the particular unit; and ‘1 whereas, the impending merger of the University of Buffalo into State University of New York to take place on or about September 1, 1962, has raised questions with regard to the application of such policies to student social organizations now in existence at the University of Buffalo, therefore, be it ‘ ‘ resolved, that the President be, and hereby is, directed to take such steps as he may deem appropriate to secure compliance with these policies at the University of Buffalo when that Institution becomes a unit of State University of New York, including the fixing of a period subsequent to the date of merger within which existing social organizations may bring themselves into compliance with these policies.”
Subsequent to the University of Buffalo being merged with State University, the social organizations concerned (including the plaintiffs herein) were allowed five years within which to comply with the existing policy of State University prohibiting nationally affiliated fraternities.
The court in reviewing all of the papers and documents submitted by the parties, finds that there are no triable issues of fact.
However, the court is presented with the following questions of law: (1) Whether the Trustees of the State University had the authority to adopt a resolution in 1953 which banned on all their campuses social organizations which had any direct or indirect affiliation with any national or other organization outside of the particular institutions, and (2) whether the said Trustees had the authority to require the fraternities at the newly merged University of Buffalo to comply with the existing State University policy when they, together with the institution, became a part of the State University in 1962?
*1033 It is conceded that the Board of Trustees is empowered by law to enact regulations governing its institutions and plaintiffs do not question the authority of the Trustees to regulate all fraternities and social organizations on State University campuses.
Furthermore, plaintiffs even admit that the State University Trustees would have acted within the scope of their authority if they “ had seen fit to abolish all social organizations ” on their campuses.
It seems that the plaintiffs’ position is that it is arbitrary and capricious for the Trustees of the State University to ban national social organizations without banning locals, and that no rational basis exists for such a classification.
Reviewing the steps which led up to the enactment of the fraternity resolution, it is readily apparent that the decision reached was not taken in an arbitrary manner and that the Trustees had valid reasons for its adoption. It appears that for over a year prior to the adoption of the 1953 resolution, a survey and study of fraternities and social organizations on State University campuses was conducted and the findings were submitted to the Board of Trustees. In conclusion the report said that ‘ ‘ In all instances it is apparent that the final control and decision of policies and practices of such fraternities and sororities is vested in the national organizations rather than in the local chapters.”
Upon the basis of those findings the report included the following recommendation:
“ The university must always be in a position to exercise sufficient supervision over students and their social organizations to assure compliance with university policies. So long as such organizations are local in nature, the situation is manageable. But when they involve ties outside the university over which the university can exercise no control, serious conflicts may arise. This is something a university cannot tolerate. It cannot allow itself to be placed in the position of sanctioning student social organizations which are governed by, and responsible to, non-university authority.
“ The existence of national fraternities and sororities at a university presents just such an anomaly * * *
“ One of the pillars upon which State University of New York was founded is that educational opportunities be made available to those qualified, without regard to race, color, religion, creed or national origin. It would be sophistry for the State University to vigorously combat discrimination in its admis *1034 sions and academic policies and, at the same time, condone those practices among the extracurricular organizations recognized by it. The academic and extracurricular programs of a university intertwine to such a degree in educating and molding a student that they cannot be severed and each judged by contradictory standards,
‘1 Where, a fraternity, sorority or similar social club is local in nature, it is easier for the university to control its formal policies and informal practices through observations, consultation and regulation, for policies are there made locally. But where such a group is only a segment of a national organization, it loses the power to make its own policies and, instead, must be bound by those determined by the national.
“ National affiliations are also a financial drain upon the local chapters. For the rather dubious advantage of belonging to the national organization each local member must support such organization by the allocation to it of a portion of his initiation fees and dues, automatically increasing the cost of his membership in the local chapter. Where the social life of an institution revolves around fraternity and sorority activities, students must either join or be left out of things. In such situations a State University such as this, which is charged with the responsibility for eliminating economic barriers to education, should exert every effort to keep the cost of these organizations at a minimum so that those who are less fortunate financially may also have an opportunity to participate. Discontinuance of these national affiliations will serve this additional purpose.”
Thus, it should be clear that the board did not act arbitrarily and capriciously in considering this problem in 1952-1953.
The difficulty with plaintiffs’ position is that they seek to attack the validity of a resolution duly adopted by the Trustees in 1953 upon the basis of a state of facts existing at the State University at Buffalo nine years later. They treat the resolution as if it were adopted de novo in 1962. The decision made by the Trustees in 1962 was to apply its existing university-wide fraternity policy to the newly merged University of Buffalo.
The issue in this case is not whether the national fraternities and sororities at the State University of New York at Buffalo actually discriminate but whether the Trustees, in the exercise of their statutory functions in establishing the educational policy of the university, had any reasonable basis for the adoption of a resolution in 1953 which banned on all their campuses social organizations which were subject to nonuniversity control, and *1035 also, whether the Trustees were within their authority to extend this policy to a newly acquired institution.
It is the opinion of this court as to the first question presented, that the Board of Trustees may adopt such resolutions, including the outlawing of national fraternities and social organizations, as it deems necessary, to its duty of supervision and control of its educational institutions (Waugh v. Mississippi Univ., 237 U. S. 589; Webb v. State Univ. of N. Y., 125 F. Supp. 910; Hughes v. Caddo Parish School Bd., 57 F. Supp. 508, affd. 323 U. S. 685; cf. Hamilton v. Regents, 293 U. S. 245).
Nor is there any merit to plaintiffs’ second contention that it was arbitrary for the Trustees of the State University to require the Buffalo local chapters of national fraternities to comply with the existing State university-wide fraternity policy when the University of Buffalo became part of the State University in 1962.
The policy adopted by the Trustees of the State University that it should be uniformly applied to all units of the university was a matter within their province in the exercise of their quasi-legislative functions in governing the university as provided for by law. (Education Law, §§ 352, 353, 355.)
It is not for the court to substitute its judgment for that of the Trustees on a matter of educational policy and direct the Trustees to except one of the university’s units from the university-wide ban of national fraternities.
Furthermore, this court does not believe that the Trustees should be required to review and determine the need for the continuation of the fraternity policy whenever an additional educational institution is merged or absorbed into the State system. Their failure to do so, does not constitute arbitrary and capricious conduct.
For the reasons stated, judgment should be awarded to defendants declaring the fraternity resolution of the State University valid and applicable to social organizations at the State University of New York at Buffalo.