In the Matter of CHAUTAUQUA INSTITUTION, Respondent, *v.* TOWN OF CHAUTAUQUA et al., Appellants. (Proceeding No. 1.)

In the Matter of CHAUTAUQUA INSTITUTION, Respondent, *v.* JOHN A. ANDERSON et al., Constituting the Board of Assessors of the Town of Chautauqua, Appellants. (Proceedings Nos. 2 and 3.)

In the Matter of CHAUTAUQUA INSTITUTION, Respondent, *v.* PATRICK LUCARIELLO et al., Constituting the Board of Assessors of the Town of Chautauqua, Appellants. (Proceedings Nos. 4 and 5.)

Fourth Department, June 30, 1970.

2

*Seymour W. Rollman, County Attorney,* for County of Chautauqua, appellant.

*Gene DeMambro, Town Attorney (Bruce K. Carpenter* of counsel), for Town of Chautauqua, appellant.

*Price & Miller (Charles H. Price* and *Ernest D. Leet* of counsel), for respondent.

MOULE, J. In these jointly tried proceedings, Chautauqua Institution sought review of tax assessments for the years 1966 through 1968 on property owned by it in the Town of Chautauqua. It claimed that certain of its property was tax-exempt and other property partially exempt under section 420 of the Real Property Tax Law. It also claimed that the partially exempt property was overvalued. The trial court held that the Institution was organized exclusively for one or more tax-exempt purposes, and the property that was used exclusively for these purposes was held to be tax-exempt. Other property, which was not so used, was held to be partially exempt or non-exempt. The court also found that certain of the partially exempt and non-exempt property was overvalued. The defendants appeal from the judgments entered on that decision.

The present Institution traces its origin to 1871. In that year the Chautauqua Lake Camp Meeting Association of the Methodist Episcopal Church started to hold meetings on the present site which was then called Fair Point. In 1876 a corporation was formed under the name of " Chautauqua Lake Summer Schools Assembly ". Its purpose as set forth in its certificate of incorporation was to " hold stated public meetings from year to year upon the grounds at Fair Point in the County of Chau-

tauqua for the furtherance of Sunday School interests, and any other moral and religious purpose not inconsistent therewith ". In 1881 the Legislature granted a charter for " The Chautauqua School of Theology " and in 1883 for " Chautauqua University ". In 1902 the three separate entities were consolidated into the present Institution.

It is interesting to note that the first book club in America began in Chautauqua in 1878, the first summer school in 1879 and the first correspondence school in 1881. Over the years the Institution has grown to the point that it now resembles a small municipality employing 700 to 800 people during the months of July and August each year.

The Institution claims tax exemption under section 420 of the Real Property Tax Law which provides in part:

" § 420. Non-profit organizations.

" 1. Real property owned by a corporation or association organized exclusively for the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, public playground, scientific, literary, bar association, medical society, library, patriotic, historical or cemetery purposes, for the enforcement of laws relating to children or animals, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation or association as hereinafter provided shall be exempt from taxation as provided in this section. * * *

" 2. If any portion of such real property is not so used exclusively to carry out thereupon one or more of such purposes but is leased or otherwise used for other purposes, such portion shall be subject to taxation and the remaining portion only shall be exempt. * * * "

From a reading of this section, it is clear that the initial test for tax-exempt status is whether the corporation or association is " organized exclusively " for tax-exempt purposes. If it is not so organized, none of its property is entitled to tax exemption. (*Matter of Pace Coll.* v. *Boyland*, 4 N Y 2d 528; *Matter of Board of Educ. of City of Jamestown* v. *Baker*, 241 App. Div. 574, affd. 266 N. Y. 636; and *Matter of Faculty-Student Assn. of Harpur Coll.* v. *Dawson*, 57 Misc 2d 112, 119.) If it is so organized, then that portion which is used exclusively for carrying out tax-exempt purposes is exempt, and that portion which is not so used is taxable. (*Greater N. Y. Corp. of Seventh Day Adventists* v. *Town of Dover*, 29 A D 2d 861, app. dsmd. 23 N Y 2d 682.)

The Institution was organized for the following purposes: "The purpose and object of said corporation shall be to promote the intellectual, social, physical, moral and religious welfare of the people. To this end it may hold meetings and provide for recreation, instruction, health and comfort on its grounds at Chautauqua; conduct schools and classes; maintain libraries, museums, reading and study clubs and other agencies for home education; publish books and serials and do such other things as are needful or proper to further its general purpose."

The appellants contend that the inclusion of the words "social" and "physical" in the charter deprives the Institution of tax-exempt status, because these purposes are not set forth in subdivision 1 of section 420 of the Real Property Tax Law.

In support of this contention, appellants cite *Matter of Beekman* (232 N. Y. 365), *Matter of De Peyster* (210 N. Y. 216) and *Matter of Kennedy* (240 App. Div. 20, affd. 264 N. Y. 691) which held that a corporation's tax-exempt status was to be determined from the purposes listed in its charter or by-laws.

The Institution contends that its actual activities must be considered along with its charter to determine whether it is entitled to tax-exempt status. In support of this contention, it cites *People ex rel. Untermyer* v. *McGregor* (295 N. Y. 237) and an article by Professor W. D. Curtiss in 52 Cornell L. Q. 551 entitled "Tax Exemption of Educational Property in New York". In *People ex rel. Untermyer* v. *McGregor* (*supra*) it was held that the inclusion of a purpose which is non-tax-exempt will not deprive a corporation of tax-exempt status if the activities of the corporation show that such purpose is merely incidental to the tax-exempt purposes. Professor Curtiss states the rule as follows at page 558: "The conclusion to be drawn from these cases is that although the statute requires that the corporation be organized *exclusively* for one or more of the statutory purposes and although it is well settled that a tax exemption statute must be construed strictly against the taxpayer, the courts will grant exemption where it appears that the purposes stated in the certificate of incorporation but which are not covered by the statute are merely incidental and subsidiary to its main purposes which are within the statute; that such incidental purposes are more or less necessary to fulfill its main purposes and that the *actual* use of the property fulfills purposes for which it was formed and which are within the statute."

Based on these latter authorities we must examine the Institution's actual activities to determine whether the non-tax-exempt

purposes listed in its charter are merely incidental to its main tax-exempt purposes.

The principal part of the Institution contains about 400 acres and is bounded on one side by Chautauqua Lake and the rest by a fence. Across the road from the fenced area, the Institution has an 18-hole golf course which is open to the public. This occupies about 155 acres and adjacent to it, the Institution owns 266½ acres of farm lands. Within the fenced area, there are 391 cottages, 206 rooming houses and 12 hotels and restaurants which are conceded to be taxable. There are also 9 denominational houses which are conceded to be nontaxable. To gain access to the grounds, one must purchase a ticket for the season, week, day or event. It is not limited to persons of any religious denomination.

The official program sets forth a number of organized activities in different fields. In the educational field, the Chautauqua Central School offers a summer high school program in co-operation with the Chautauqua Institution. It offers basic high school courses and runs from the first week in July through the second week in August and is approved by the State Education Department.

Syracuse University operates a summer school which runs six weeks. A student taking a maximum schedule can earn a credit at Syracuse University equivalent to two semester courses; courses are given in fine arts, music theory, education and liberal arts. During the years of 1966, 1967 and 1968 an average of 50 courses was offered each year for university credits, and the faculty averaged 21 instructors each year. The average enrollment was 352 students, 116 of whom received scholarship aid from the Institution. An additional 45 full scholarships at the expense of $25,000 were provided by the Martha Jennings Foundation of Cleveland to bring white and black students from the Cleveland area to the Institution.

The Chautauqua Summer School runs a program of formal summer study covering music, art, ballet, modern dance and special interest courses. During 1967, 467 students were enrolled in the school of music including 10 to 15 foreign students; 448 students were enrolled in the school of art; 137 in the school of ballet and modern dance; 45 in the writer workshop and 318 in the special interest courses and adult education courses. The Institution issues a booklet consisting of 67 pages listing these courses.

There are informal programs of study; for instance, the Chautauqua Literary and Scientific Circle conducts a reading

program organized around selected books. The art association has programs and meetings, conducts exhibitions, maintains galleries and stimulates original work through an outdoor regional art festival. The Institution and Syracuse University cosponsor a summer student reading program designed for high school students of average ability or above who plan to attend college. Chautauqua Institution and the American Assembly and Columbia University cosponsor a three-day conference for 60 leaders from various walks of life on such current topics as " The Population Dilemma ". A lecture series in the fields of international relations, economics, science, education and literature is held each weekday, and about 1,500 persons are attracted to it daily.

There are three major Sunday religious services. The religious program for the year 1967 is set forth in a 26-page brochure. In addition to the Sunday morning services, 25 religious services are sponsored by the Institution. They do not include those of the nine denominations on the grounds.

There are numerous activities for young people. They include a children's school, the boys' and girls' club, the high school club and the college club. They are recreational in nature. There is an 18-hole golf course which is open to the public. Boating, swimming and tennis are available. Musical and dramatic productions are put on by a professional company. The faculty of the school of music performs concerts as the Chautauqua Symphony, and student groups also give recitals. Charges are made for these activities.

The Institution is not operated at a profit, and it is only on the annual receipt of some $90,000 to $100,000 in gifts that it is able to maintain its financial stability. The Institution has long been accepted by the Department of Internal Revenue as a nonprofit corporation entitled to a tax-exempt status.

We should consider these proceedings in the light of the philosophy set forth in *Walz* v. *Tax Comm. of City of N. Y.* (397 U. S. 664). There, Mr. Justice BRENNAN, in a concurring opinion, referring to religious organizations which engaged in secular purposes, stated (p. 687) that " these organizations are exempted because they, among a range of other private, nonprofit organizations contribute to the well-being of the community in a variety of nonreligious ways, and thereby bear burdens that would otherwise either have to be met by general taxation, or be left undone, to the detriment of the community ". He further stated (p. 688) " ' the public welfare activities and the sectarian activities of religious institutions are  *  *  *  intertwined ' ".

It appears that the greater part of the activities of the Institution is educational and religious, and any recreational and sports activities are reasonably incidental thereto. (*Matter of St. Luke's Hosp.* v. *Boyland,* 12 N Y 2d 135; *People ex rel. Watchtower Bible and Tract Soc.* v. *Haring,* 8 N Y 2d 350.) It, therefore, meets the test for tax-exempt status and that portion of its property which is used for purposes set forth in section 420 of the Real Property Tax Law is tax-exempt, and that portion which is not so used is taxable. The Trial Justice set forth the various properties involved and stated in what way they were used. He found that the use of the following properties was reasonably incidental to the over-all function of the Institution and, therefore, tax-exempt: administrative control, lakefront vistas, roadways and rights of way, community services, program facilities and activities, school facilities, dormitories and housing facilities, parks and recreation facilities, campus areas, parking areas for schools or program activities, heating and filtration plants, carpenter, paint and lumber shops.

The Trial Justice found that the Norton Parking Lot was 80% tax-exempt, that the Colonnade Building was 50% tax-exempt and the post office 80% tax-exempt, and found that the refectory, golf course, boat house and diner were fully taxable. He also set the assessed values on the partially and fully taxable property.

The record substantiates these findings and determinations. The judgments should, therefore, be affirmed.

GOLDMAN, P. J., MARSH and WITMER, JJ., concur.

Judgments unanimously affirmed, without costs.