UNIVERSITY OF ROCHESTER, Respondent-Appellant, v WALLACE J. WAGNER, as Assessor of the City of Rochester, et al., Appellants-Respondents.

UNIVERSITY OF ROCHESTER, Respondent-Appellant, v WALLACE J. WAGNER, as Assessor of the City of Rochester, et al., Appellants-Respondents.

Fourth Department, July 13, 1978

342

## APPEARANCES OF COUNSEL

*Louis N. Kash, Corporation Counsel (Merwyn M. Kroll* of counsel), for Wallace J. Wagner and another, appellants-respondents.

*William J. Stevens, County Attorney (Francis E. Calvaruso of counsel)*, for County of Monroe, appellant-respondent.

*Nixon, Hargrave, Devans & Doyle (G. Robert Witmer, Jr., of counsel)*, for respondent-appellant.

**OPINION OF THE COURT**

MOULE, J.

The appeal in these declaratory judgment actions raises for review the taxable status of nine fraternity houses owned by plaintiff University of Rochester (University) and located on its River Campus property. As of October 1, 1970 they were placed on the tax rolls for the first time and have remained there. The University paid all of the taxes assessed against it under protest and brought this action against the City of Rochester, the Rochester School District, the City Tax Assessor and the County of Monroe seeking a ruling that the subject premises were exempt from real property taxes and that the taxes assessed against it and paid were void.

The University acquired the River Campus property upon which the fraternity houses are located by warranty deed dated February 20, 1926. The River Campus is located within the City of Rochester and is bounded by Mt. Hope Cemetery, the Genesee River and the Barge Canal. In addition to the nine fraternity houses, the campus contains academic buildings, classrooms, laboratories, a library and residential, dining and athletic facilities. The fraternity houses are located on that part of the River Campus known as the Fraternity Quadrangle.

The nine fraternity houses were originally constructed at the invitation of the University and the costs of construction were borne by the individual fraternities. The site for each house was chosen by lot with the architectural design supervised and construction materials approved by the University's architects. Seven of the houses were built during the 1930's: Theta Chi, Delta Kappa Epsilon, Theta Delta Chi, Delta Upsilon (now Drama House) Psi Upsilon, Sigma Chi and Alpha Delta Phi. The Phi Epsilon Pi House (now Medieval House) was constructed during the 1950's and the Sigma Alpha Mu House was constructed between 1961 and 1968. Each fraternity house has been continuously used as a residence by its fraternity and, at times, other undergraduate students at the University.

Since the University took title to the River Campus property, there has been no recorded interest, or written document evidencing an interest in any other party, in the real property or improvements. The relationship that existed for many years between the nine fraternities and the University was one that placed certain obligations pertaining to the premises upon the fraternities in exchange for the permission or license to occupy and control the buildings they constructed on the University's property. Between October 1, 1969 and September 1, 1971, six of the fraternities[1] entered into written agreements with the University under which they affirmatively acknowledged "the complete ownership and unrestricted right of the University of, in and to [the fraternity houses] and the land beneath and around [the buildings]." These six fraternities further acknowledged that they had "no right to continued use, enjoyment, occupation, or possession of [the houses] and land and that [such rights] have been and are subject to the unrestricted will of the University." The remaining three fraternities, Theta Chi, Theta Delta Chi and Delta Kappa Epsilon, did not enter into similar agreements with the University.

Following a lengthy trial at which testimony was received concerning the control and use of the nine fraternity houses vis-à-vis the University, the court found with respect to the six fraternities that had executed written agreements with the University, that these houses were generally controlled, operated, maintained and supervised by the University in the same manner as resident dormitories on campus. The court specifically found that since the time of execution of the agreements, the six houses have been "used exclusively for carrying out the educational purposes of plaintiff" during the following periods:

1. Sigma Chi House, from and including October 1, 1971 through and including October 1, 1973.

2. Alpha Delta Phi House, from and including October 1, 1971 through and including October 1, 1973.

3. Psi Upsilon House, from and including October 1, 1971 through and including October 1, 1973.

---

1. The names of the fraternities entering into these agreements and the dates of execution are as follows: Phi Epsilon Pi (Medieval House)—October 1, 1969; Delta Upsilon (Drama House)—February 1, 1971; Psi Upsilon, Sigma Chi, Alpha Delta Phi and Sigma Alpha Mu, all on September 1, 1971.

4. Sigma Alpha Mu House, from and including October 1, 1971 through and including October 1, 1973.

5. Delta Upsilon House (Drama House), from and including June 1, 1971 through and including October 1, 1973.

6. Phi Epsilon Pi House (Medieval House) from and including October 1, 1970 through and including October 1, 1973.

The court also found that the three fraternities that did not execute agreements with the University operated autonomously under the license given them by the University and were substantially devoted to the social, personal and fraternal objectives of their members. Therefore, the court found these fraternity houses to be nonexempt from tax liability.

Pursuant to the above findings, judgment was entered declaring the following assessments made by defendants to be invalid, illegal and void and to be stricken from the tax rolls:

| Sigma Chi House | County Tax<br>City and School Tax | - 1973, 1974<br>- 1972-73<br>- 1973-74<br>- 1974-75 |
| Alpha Delta Phi House | County Tax<br>City and School Tax | - 1973, 1974<br>- 1972-73<br>- 1973-74<br>- 1974-75 |
| Psi Upsilon House | County Tax<br>City and School Tax | - 1973, 1974<br>- 1972-73<br>- 1973-74<br>- 1974-75 |
| Sigma Alpha Mu House | County Tax<br>City and School Tax | - 1973, 1974<br>- 1972-73<br>- 1973-74<br>- 1974-75 |
| Delta Upsilon House<br>(Drama House) | County Tax<br>City and School Tax | - 1972, 1973, 1974<br>- 1972-73<br>- 1973-74<br>- 1974-75 |
| Phi Epsilon Pi House<br>(Medieval House) | County Tax<br>City and School Tax | - 1972, 1973, 1974<br>- 1971-72<br>- 1972-73<br>- 1973-74<br>- 1974-75 |

As a result of these tax assessments being stricken from the tax rolls, the University was permitted to recover $50,769.65 in city and school taxes and $14,506.83 in county taxes. The taxes assessed against the University with respect to Theta Chi House, Theta Delta Chi House and Delta Kappa Epsilon were held to be valid.

Defendants now appeal from that part of the judgment which ordered that assessments upon the Sigma Chi, Alpha Delta Phi, Psi Upsilon and Sigma Alpha Mu fraternity houses be stricken from the rolls from and including October 1, 1971 through and including October 1, 1973.[2] Defendants also appeal from the judgment insofar as it granted plaintiff an additional allowance of $3,000 pursuant to CPLR 8303 (subd [a], par 2) and from the order which granted said additional allowance to plaintiff and denied defendants' application for an additional allowance.

Plaintiff cross-appeals from that part of the judgment which upheld the nonexempt status of the Theta Delta Chi, Delta Kappa Epsilon and Theta Chi fraternity houses for all tax years involved; the Sigma Chi, Alpha Delta Phi, Psi Upsilon and Sigma Alpha Mu fraternity houses for the period from October 1, 1970 through and including October 1, 1971; and the Delta Upsilon House (Drama House) for the period from October 1, 1970 through June 1, 1971.

Section 421 of the Real Property Tax Law provides in pertinent part as follows:

"1. (a) Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, moral or mental improvement of men, women or children or cemetery purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation or association as hereinafter provided shall be exempt from taxation as provided in this section. * * *

"2. If any portion of such real property is not so used exclusively to carry out thereupon one or more of such pur-

---

2. Defendants do not, in their brief, contest the court's ruling with respect to the tax-exempt status of the Delta Upsilon House (Drama House) and the Phi Epsilon Pi House (Medieval House).

poses but is leased or otherwise used for other purposes, such portion shall be subject to taxation and the remaining portion only shall be exempt".

The initial test for tax-exempt status is whether the corporation or association is "organized exclusively" for tax-exempt purposes *(Matter of Genesee Hosp. v Wagner,* 47 AD2d 37, 43, affd 39 NY2d 863; *Matter of Chautauqua Inst. v Town of Chautauqua,* 35 AD2d 1, 3). In order to determine whether the corporation or association is so organized, an examination of the stated purposes of the organization, as well as a view of its actual practices, is required *(Matter of Faculty-Student Assn. v Sharkey,* 35 AD2d 161).

The second test to be applied pertains to the actual use of the realty in question and requires a showing that the property is "used exclusively" for exempt corporate purposes *(Matter of Genesee Hosp. v Wagner, supra).* Under this test it must be shown that the particular use of the property is "reasonably incident" to the owner's exempt purposes *(Matter of St. Luke's Hosp. v Boyland,* 12 NY2d 135, 143; *People ex rel. Watchtower Bible and Tract Soc. v Haring,* 8 NY2d 350, 358). In further explanation of the "reasonably incident" doctrine several recent cases have expounded on the criteria for adjudging whether a particular property meets the statutory standards. The determination of whether the property is used exclusively for the statutory purposes depends upon whether its primary use is in furtherance of the permitted purposes *(Matter of Association of Bar of City of N. Y. v Lewisohn,* 34 NY2d 143, 152; *Gospel Volunteers v Village of Speculator,* 33 AD2d 407, 411, affd 29 NY2d 622; see, also, *Greater N. Y. Corp. of Seventh-Day Adventists v Town of Dover,* 29 AD2d 861, app dsmd 23 NY2d 682). A merely incidental use of the property for other than exempt purposes will not destroy the exemption *(People ex rel. Watchtower Bible and Tract Soc. v Haring, supra).* However, to the extent that nonexempt uses do occur on the premises and where they cannot be said to be merely "incidental" purposes an allocation or partial exemption is mandated *(Matter of St. Luke's Hosp. v Boyland, supra; Matter of Genesee Hosp. v Wagner, supra; Matter of Chautauqua Inst. v Town of Chautauqua, supra).* Moreover, while an exemption statute is to be construed strictly against those arguing for nontaxability, the interpretation should not be so narrow and literal as to defeat its settled purpose, which in this instance is that of encouraging, fostering and protecting

educational institutions *(People ex rel. Watchtower Bible and Tract Soc. v Haring, supra; Matter of Syracuse Univ.,* 214 App Div 375, 377).

Historically, an application of these tests to property owned by educational institutions has led to findings of exemption or nonexemption dependent primarily upon the use of the property involved. Dormitories, dining halls, hospitals, training schools for nurses, stores for supplies, and athletic fields used by students for athletic games and exercises and not as sources of institutional income, are essential parts of universities and colleges and have been held to be tax exempt based upon the theory that education contemplates not only the mental and moral but the physical training and welfare and the proper maintenance of those in attendance at the institution (see *Matter of Syracuse Univ., supra; People ex rel. Board of Trustees v Mezger,* 98 App Div 237; see, also, *Matter of Pace Coll. v Boyland,* 4 NY2d 528; *Matter of Faculty-Student Assn. v Sharkey,* 35 AD2d 161, affd 29 NY2d 621, *supra; People ex rel. Clarkson Mem. Coll. of Technology v Haggett,* 274 App Div 732, affd 300 NY 595; *Matter of Syracuse Univ.,* 59 Misc 2d 684; *Matter of Pratt Inst. v Boyland,* 16 Misc 2d 58).

Although dormitories have traditionally received tax-exempt status, college fraternities have not been accorded similar treatment (see *Matter of Cornell Univ. v Board of Assessors of City of Ithaca,* 24 AD2d 526; *People ex rel. Delta Kappa Epsilon Soc. of Hamilton Coll. v Lawler,* 74 App Div 553, affd 179 NY 535; *People ex rel. Cornell Univ. v Thorne,* 184 Misc 630).

In the most recent case, *Matter of Cornell Univ. v Board of Assessors of City of Ithaca (supra),* the University owned the fraternity houses and entered into lease agreements with the fraternities under which rentals included the cost to the University of utility services, repairs, insurance, maintenance of the grounds and taxes that might be assessed against the property. Each fraternity elected their members who occupied the house and when there was vacant space the University had the right to assign it to other students. The court held that although fraternities performed the essential functions of housing and feeding students, the premises were also devoted, in substantial part, to the social and other personal objectives of a privately organized, self-perpetuating club, controlled by graduate as well as student members. On such basis, the

premises were found not to be used "exclusively" for educational purposes, within the intendment of the exemption statute.

In *People ex rel. Cornell Univ. v Thorne (supra)* the court, while recognizing that dormitories established by a college for the use of *all* students may well be exempted, noted that fraternity houses are limited to students who are members of the respective fraternities and those designated as eligible to live therein (184 Misc 630, 633). With respect to the two fraternity houses at issue in that case, the court referred to the differences between them and the dormitories on campus (pp 637-638):

"While in all dormitories provision is made for social and recreational activities, they are furnished to a much greater extent in these buildings. Dormitories are equipped and furnished by the university. These buildings were furnished by the respective fraternities. In ordinary dormitories, the utility service is included in the rent. Here it is billed to the chapters. The university's representative assigns dormitory rooms. In these buildings each chapter makes the assignment. * * *

"The only substantial difference between these fraternity buildings and other fraternity houses on and off the campus is that the latter are owned by the fraternities, while the title to the former is in the university. But, although we do not place our decision on this fact, the university's title to these buildings is limited at least so far as beneficial use of the buildings is concerned. It may not deprive the interveners of the exclusive use without paying for the buildings. It may not place any student therein except upon the request of the respective chapters. It can only rent to their designees. It cannot raze or even remodel the buildings. It cannot sell or deliver them. Relator says the interveners have no liens on the buildings. Technically, they have none. Practically, they can interfere with their free use."

Finally, in *People ex rel. Delta Kappa Epsilon Soc. v Lawler* (74 App Div 553, affd 179 NY 535, *supra),* the relator, Delta Kappa Epsilon Fraternity, was one of seven Greek letter societies existing at Hamilton College. The fraternity owned a chapter house in the Village of Clinton, the house not being located on the college campus. In finding that this property was not used exclusively for educational purposes and, therefore, nonexempt, the court reasoned (p 558): "And while it may be said that the relator is connected with Hamilton

College, and that its chapter house is in a certain sense an adjunct thereto, yet so far as ownership, occupation and control are concerned it is entirely independent of the college. Its primary purpose is to afford the members of the fraternity owning it with an abiding place while attending college. It is there that they eat and sleep; it is there that they mingle with each other in social intercourse; it is there that they entertain their friends, and to that end indulge in dancing and other similar amusements. In short, it is to all intents and purposes a club house, a place for rest, recreation and fraternal intercourse, rather than for the purposes for which it is claimed to have been organized, which purposes are plainly secondary and incidental; and such being the case, we do not see how, within the well-settled policy of the law to which allusion has just been made, it is entitled to exemption from taxation."

Applying the statutory test as interpreted by the courts to the case here, we note, first, that the parties stipulated to the fact that the University is a nonprofit corporation "organized exclusively" for educational purposes. The University acquired the River Campus property upon which the nine fraternity houses were constructed in 1926 and the record is devoid of any evidence showing an interest in any other party in this property or the improvements since that time. Therefore, we agree with the court's determination that the University owns both the land and the fraternity houses erected thereon.

The more difficult task is to examine the type and character of the use of the nine fraternity houses in order to determine whether these buildings are "used exclusively" for educational purposes. In making its findings, the trial court relied primarily upon the fact that six of the fraternities executed written agreements with the University under which they acknowledged the complete ownership and unrestricted right of the University in the fraternity houses and, further, that the fraternities' rights to use, enjoy, occupy and possess the buildings were at the will of the University. The court concluded that the six houses were, since the date of the execution of the agreements, used exclusively for carrying out the educational purposes of the University and, therefore, tax exempt. The three houses that did not execute agreements were found to be operated autonomously and to be devoted substantially to social, personal and fraternal objectives. These houses were found to be nonexempt.

Although it cannot be disputed that the execution of the

above agreements is relevant to show the change in the nature of control exercised by the University over the fraternities, such fact does not determine the actual use of the nine fraternity houses and whether such use was or was not exclusively for educational purposes. The record shows that subsequent to the signing of the agreements, the University assumed responsibility for and control of the maintenance, repair, cleaning and securing of six of the houses and adopted a policy of determining, billing and collecting from each student the rent for his room.[3] However, the actual use of these six fraternity houses prior to and subsequent to their entering into agreements with the University did not change merely as a result of signing the agreements. Stated in other terms, the issue is not one of control, although that is a factor to be considered; rather, the issue is one of usage and whether all or part of the property in question was and is being used exclusively for educational purposes (see *Matter of Genesee Hosp. v Wagner,* 47 AD2d 37, 46, *supra*).

The fraternity houses are utilized by approximately 210 of the more than 3,000 students residing on the University's River Campus. The residential hall system at the River Campus is divided administratively into four parts. The first consists of two complexes known as Hill Court and The Towers. Hill Court is composed of six buildings housing 542 students and The Towers contains two nine-story buildings housing 520 students. The second part, known as The Hill, is a single, four-winged facility housing 640 students. Third is the Quadrangle, consisting of six separate buildings housing 1,069 students and, finally, there is the Quadrangle Annex which contains the fraternity houses.

Each of the fraternity houses has similar floor plans. The first floors of the houses contain living rooms, libraries, bathrooms, coat rooms and guest rooms. The second and third floors consist of sleeping quarters and bathrooms for 10 to 41 students. The basements of the houses contain dining areas and recreation rooms. The University maintains and controls the exterior grounds, walkways and access points.

With respect to eating facilities, the organized board plans on the River Campus are run by the University and by five of the fraternities. By University rule, all freshmen are required

---

3. It is important to note, however, that prior to entering into these agreements, the University had the absolute right as owner of the property to remove all nine fraternities from the premises and use the property as it so desired.

to be on a board plan of either the University or of a fraternity house. Upperclassmen have several board plan options and may opt for a no-board plan if residing in residence halls with kitchen facilities. Fraternity board plans are open to nonmembers, and members of the fraternity houses may elect to be on the University's board plan. In the houses which do not have an organized board plan, the residents are entitled to use the kitchen to prepare meals in the same manner as students in other residential halls which provide a no-board plan option.

The residents of the fraternity houses assess themselves social fees which range from $15 per year to $170 per year, in comparison to a $5 per year University fee assessed against nonmember students. The activities in the fraternity houses range from traditional parties, the number of which vary with each house and are often open to nonmembers, to service projects in the community. These projects include work with physically and mentally handicapped people, a Heart Fund basketball dribbling marathon, a nighttime escort service for female students and provision of services to patients at Strong Memorial Hospital. The fraternities also hold weekly meetings at which are discussed the internal operations of the house and, oftentimes, they host University classes and discussions. The two fraternity houses that defendants do not challenge the tax-exempt status of, Phi Epsilon Pi (Medieval House) and Delta Upsilon (Drama House), have become defunct as fraternities and are now utilized by the University as residence houses in which the student life revolves around interest in medieval studies and drama. The students who reside therein are selected on the basis of their proven interest in these areas.

In comparing the fraternity facilities to the dormitories and examining the variety of activities engaged in by residents of both, we find a striking similarity. Many of the dormitories provide kitchenettes for use by residents who are not members of a board plan. The sleeping accommodations range from single and double rooms off long corridors to suites for six students. The dormitories contain lounges of varying sizes which constitute common social areas. Every residence hall has its own unit of self-government with its own set of by-laws. These hall councils meet every two to three weeks to discuss social activities and maintenance of the facilities. Parties and dances are held in the dormitories, many of which

are open only to residents of the hall in which they are held. Moreover, the University assigns resident advisors to the fraternity houses as well as the dormitories, and it periodically reviews the health and viability of the fraternities. The University regulations regarding the conduct of students apply with equal force to those students living in the subject houses as they do to those students living in the dormitories. In many respects, the function and operation of the fraternity houses is indistinguishable from that of the tax-exempt dormitory facilities at the River Campus.

■ It is well accepted that education contemplates not only the mental and moral, but also the physical training and welfare and the proper maintenance of those in attendance at the University. In meeting its responsibility for the intellectual growth and the physical, social and moral development of its students, the University provides housing, religious and health needs, athletic teams and facilities, campus radio and television stations and student newspaper and government offices. To enable educational institutions to provide these services, property associated therewith, including dormitories, has been found to be used exclusively for educational purposes and, therefore, exempt from taxation. Like dormitories, the fraternity houses here serve the primary function of housing and feeding students while they attend the University and complete the required curriculum. This use has been held to be in furtherance of the University's educational purposes. Moreover, the social intercourse and recreational activities that take place in the fraternity houses are similar both in quantity and quality to that which occurs in the dormitories. This social activity, although incidental to the primary use of the facilities, is essential to the personal, social and moral development of the student and should not be found to change the character of the property from one whose use is reasonably incident to and in furtherance of the University's exempt purposes to a use which is not. For the same reasons that dormitories have traditionally been held tax exempt, we see no reason why under the facts of this case the fraternity houses should not be accorded similar treatment.

A major argument in opposition to holding fraternity houses tax exempt, as discussed in the early cases, concerns the exclusivity of fraternity membership and the existence of discriminatory admission policies. The record shows, however, that with respect to the fraternities at the University of

Rochester, all those students who display a serious interest in joining receive pledge commitments. Moreover, there is no evidence in the record of any animosity between the general student body and the fraternity members. Furthermore, the University has always reserved the right to assign nonmembers to live in the fraternity houses and has done so on occasions where the houses were not full.

The house fraternities are not the only groups which receive a form of special treatment at the University. There are two nonhouse fraternities that are allocated rooms in the residence halls outside of the Fraternity Quadrangle. The internal operation of these fraternities is similar in nature to that of the house fraternities but the dormitory space occupied by the nonhouse fraternities has never been placed on the tax rolls. Significantly, the University also gives room preferences to other special interest groups such as human relations and fine arts groups. These special interest groups are given the right to determine who will live in their respective facilities as are the house and nonhouse fraternities.

Fraternity houses are not as commonplace as they were years ago. Evidencing this is the fact that the Trustees of the State University of New York have banned on all its campuses social organizations which have any direct or indirect affiliation with any national or other organization (see *Beta Sigma Rho v Moore,* 46 Misc 2d 1030, affd 25 AD2d 719). Our case is unique inasmuch as the University has owned the fraternity houses since their construction, all the houses are located on the college campus and the University has always had the right to exercise complete control over the houses and use them for whatever purposes it so desired. Rather than interfere to any great extent in the daily operation of the houses, the University, satisfied with the use to which the houses are being put and the role they serve in the over-all University setting, has chosen to permit their operation to continue. Clearly, the fraternities are components of the River Campus residential system and represent a major part of the educational commitment of the University to provide resources and facilities for the needs of all of its students.

Having found that the University owns all nine fraternity houses and is organized exclusively for educational purposes and inasmuch as the primary use of these houses was and is in furtherance of educational purposes, we hold that the nine

fraternity houses constitute tax-exempt property and that all assessments made against this property are invalid.

■ Finally, we find that the award of an additional allowance of $3,000 to plaintiff was not an abuse of discretion. Under CPLR 8303 (subd [a], par 2), a trial court may award to any party to a difficult or extraordinary case, where a defense has been interposed, a sum not exceeding 5% of the sum recovered or claimed, or of the value of the subject matter involved, and not exceeding the sum of $3,000. Among the factors to be considered on an application for an additional allowance are the general character of the action, the extent of litigation involved therein, the period of its continuance and the trouble of conducting it, the time and effort consumed in preparing the case for trial, the complexity of the factual and legal issues, and the fact that a large sum is dependent upon the decision of the case, increasing the care and responsibility of the attorney (see *Chaffee v Rahr,* 181 Misc 64, 70; 8 Weinstein-Korn-Miller, NY Civ Prac, par 8303.12).

The case at bar was both difficult and extraordinary, concerning as it did the tax-exempt status of buildings occupied by nine separate fraternal organizations over a period of several years. In order to show the use of the property for educational purposes, it was necessary for plaintiff to produce 22 witnesses, two of whom were expert witnesses brought from out of State at great expense. Additionally, plaintiff introduced in evidence 44 exhibits of material which attests to the expansive development of the complex factual issues required for a resolution of this case. Moreover, plaintiff's preparation and presentation at trial, which took over two weeks to complete, required the efforts of two attorneys for a total of over 900 hours. Furthermore, a lengthy trial brief and proposed findings of fact and conclusions of law were submitted. In comparison, defendants called but one witness and introduced in evidence only eight exhibits.

On this record we cannot say that the trial court's grant of an additional allowance of $3,000 to plaintiff and its denial of a similar award to defendants was improper (cf. *De Lisio v Clyde Milling Corp.,* 24 AD2d 823). The Trial Judge was in a position to evaluate properly the merits of the applications for additional allowances and, absent an abuse of discretion, we should not set aside his award.

Accordingly, the judgment should be modified by declaring the nine fraternity houses tax exempt and striking all assess-

ments against these houses from the tax rolls as of October 1, 1970; the judgment in all other respects should be affirmed.

MARSH, P. J., DILLON and SCHNEPP, JJ., concur; DENMAN, J., not participating.

Judgment unanimously modified, on the law and facts, in accordance with opinion by MOULE, J., and judgment as modified, and order, affirmed, without costs.