In the Matter of GENESEE HOSPITAL, Respondent, *v.* WALLACE WAGNER, as Assessor of the City of Rochester, et al., Appellants.

Fourth Department, February 28, 1975.

*Louis N. Kash, Corporation Counsel (Merwyn M. Kroll of counsel), for appellants.*

*Harris, Beach & Wilcox* (*Edward R. Macomber* and *Douglas S. Gates* of counsel), for respondent.

MARSH, P. J. This is a proceeding commenced by petitioner, Genesee Hospital, in accordance with article 7 of the Real Property Tax Law seeking judicial review of an assessment made by respondent Wagner, as assessor of the City of Rochester and upheld by the respondent Board of Assessment Review for the City of Rochester for the tax years 1970–1971 and 1971–1972 on a certain office building constructed and owned by Genesee Hospital, a tax-exempt hospital. Pursuant to section 712 of the Real Property Tax Law no answer was served by respondents and therefore all of the allegations in the petition are deemed denied. It is petitioner's contention that the valuations and assessments of petitioner's real property are illegal in that said property "is devoted to a use which is reasonably incident to the major purposes of said hospital, to wit: to provide better health care for its patients, and as such is totally exempt pursuant to section 420 of the New York Real Property Tax Laws." In opposition thereto, respondents-appellants, Wagner and the City of Rochester contend that the tax exemption provided by section 420 of the Real Property Tax Law requires a two-dimensional showing, that is, that (1) the organization claiming the exemption has to fulfill one of the purposes outlined in section 420, in this case, a hospital purpose, and secondly the specific piece of property for which the exemption is claimed has to be used exclusively for carrying out one or more of the purposes of the hospital.

The facts underlying the present dispute are essentially uncontroverted.

The Genesee Hospital has been located at its present site for approximately 90 years. In 1969 the hospital, at a cost of about $1,700,000, completed the construction of a three-story brick structure on the hospital's property which was connected to the main hospital building by hallways on two levels, at the second floor and at the basement. This building, known as the Doctors Office Building, is the subject property involved in this proceeding. The building contains about 39,000 square feet of usable rental space on the three above ground levels and approximately 9,000 square feet in the basement. At the time of trial, in September, 1971, the building housed the private offices of about 40 attending staff physicians of the hospital out of a total medical staff of approximately 220 physicians. Office space in the Doctors Office Building is available only to physi-

cians on the staff of the Genesee Hospital and in each case the rental period is for a minimum term of 5 years. Also located in the building are an ambulatory X-ray unit containing 3,463 square feet, the laboratory, research area and office of the chief of surgery, Dr. Renee Menguy (3,950 square feet), and the dietary unit of the hospital (216 square feet). Also planned for the building but not in operation at the time of trial was an ambulatory care unit to replace the former out-patient department of the hospital. The latter facility was planned for the basement and first floor of the Doctors Office Building.

With respect to one of the hospital facilities housed in the Doctors Office Building, to wit, the ambulatory X-ray unit the City of Rochester disputes that this facility can be considered a direct hospital purpose because the radiologists who have charge of the facility receive a percentage fee based upon the hospital billings rather than a flat-rate salary from the hospital. It is a common practice in hospitals today for radiologists to be paid in this manner. The radiologists are paid by the hospital and also receive a percentage of billings from X rays taken at the hospital's in-patient facility. The trial court in its decision did not make a distinction between the various facilities within the building, but determined that the property was exempt in total as being " reasonably incident " to the hospital's exempt corporate purposes.

In addition to being a hospital for the care of its patients, Genesee Hospital is also a teaching institution for medical students, interns, residents, and nurses. Since 1948, the hospital has been affiliated with the Medical School of the University of Rochester. Genesee Hospital has accreditations in nursing education, X-ray education, and dietitian education as well as from the Council on Medical Education of the American Medical Association in medicine, surgery, pathology, pediatrics, obstetrics and gynecology and from the American Dental Association in dentistry. The hospital has 366 beds.

In recent years competition for qualified interns and residents has been intense. In order to facilitate the placement of interns in our hospitals a National Intern Matching Program was developed. This is a system which operates by having both the hospitals and the graduating medical students list their orders of preference for internship and a computer matches the student to the hospital which is highest on his list. In recent years the Genesee Hospital has seen a decline in the number of interns it has been able to attract from the matching program. The reasons assigned for this unfortunate trend suggest that

the problem exists beyond just the City of Rochester and the State of New York into the entire Northeast portion of the country. High taxes are cited as well as the desire on the part of the interns to locate in warmer climates in the South and on the West Coast.

Confronted with this trend Genesee Hospital determined that if it was to improve as a high-quality medical and teaching hospital it would have to do something to attract well-known physicians onto its staff as well as attract and retain the better interns and residents. The construction of a Doctors Office Building was thought to be a step in that direction. As stated by Dr. Alvin Ureles, chief of medicine at Genesee Hospital and a full professor at the University of Rochester Medical School, in order to attract the best possible medical staff Genesee Hospital must develop a better program. He said, "we must have better teachers, we must have teachers delivering at the bedside more than ever, and our reputation has to grow professionally, and our professional building is one of many factors that will help us in that direction."

The thinking behind the original proposal to construct an adjacent professional office building attached to the hospital proper was given by Herman Waggershauser, former president of the Board of Directors of Genesee Hospital. Mr. Waggershauser testified that the function of the hospital was not solely the care and treatment of patients but also involved the development of group practices by physicians and the improvement of the medical education of doctors. To improve the educational function it became essential to have doctors close by the hospital. As far as the hospital was concerned the only purposes of the Doctors Office Building were to improve medical care in the community and to improve the training and education of doctors. The plan which was developed to accomplish these purposes provided that any physician on the staff of Genesee Hospital could rent space in the hospital's professional office building for a leasehold period of generally five years. The doctors were not restricted in the amount of time they were permitted to spend seeing private patients nor the amount of money they could earn through their private practices. Also, the doctors were not required to teach or to increase their previous level of teaching, if any, after their move into the professional building. However, the anticipation was that the close proximity of the attending physicians to the hospital would actually increase the teaching time and availability of the physicians to spend more time in the hospital than before, thus increasing

and improving patient care as well as the educational function within the hospital. Several physicians who moved into the Doctors Office Building testified that in fact the close proximity of their private offices to the hospital did increase their availability to the hospital and consequently increased the time they had to devote to patient care and to training and educating the interns and residents at the hospital. It was generally agreed that whatever advantages existed by virtue of having their offices essentially under the same roof as the hospital were present only during the office hours of the doctor since in the evenings and on most weekends doctors would not be in their offices anyway, thus the proximity factor would not then be present. According to several of the physicians, however, the added versatility and ability to flow back and forth to the hospital for consultation, patient care and emergencies increased the medical care and teaching function of the hospital.

However, it also appears that a great deal of teaching is still being done by physicians who are not located in the Doctors Office Building and, conversely, many doctors who rent space there either do not or have not increased the teaching schedules as a result of the move. Basically, all agreed that teaching is a matter of the personal preference of the individual physician. Most teaching occurs right in the hospital. Generally, teaching occurs at the bedside of the patient during informal discussions between the house staff and the attending physician. Some teaching is done in the doctor's private office, or off the premises at other hospitals, but the bulk of the teaching is not done by schedule or by appointment but rather through day by day rounding on the floor with the resident, intern or medical student. In surgery most teaching occurs in the operating room by watching the technique of other surgeons and ultimately by participation of the resident or intern himself. Formal lectures and conferences are also given but these do not amount to a large portion of the time spent in the learning process. Similarly, Dr. Farooqui, in obstetrics and gynecology, testified that very little formal teaching takes place in the Doctors Office Building because in his field the educational function, for the most part, occurs in the delivery room. From Dr. Farooqui's point of view it does not matter where the doctor is located as long as he gets there in time to deliver the baby.

Thus, it appears that the Genesee Hospital's avowed purpose in constructing the Doctors Office Building was for the dual purpose of upgrading the hospital in terms of patient care and teaching quality. The aim is to attract well-known and high

quality medical personnel at all levels. There is some indication that the program has been partially successful in that two eminent physicians, Dr. Renee Menguy from the University of Chicago has moved to Genesee Hospital as chief of surgery and Dr. William Chey has transferred from Philadelphia. The thinking is that once physicians such as these are attracted to the hospital others will follow and all connected with the hospital will benefit. However, it was also pointed out that at the time of trial it was still too early to tell whether the facility will be able to attract and retain the faculty and students hoped for. The Doctors Office Building provided by Genesee Hospital is at present time an innovation in providing medical services to the community. It is not a common practice in most hospitals, although it appears that more and more hospitals especially in the northeast section of the country are finding it necessary to provide similar facilities to their physicians. It is definitely a convenience to the hospital and to the doctors and undoubtedly all agree can result in improved patient care and improved teaching and educational functions. The improvement in the hospital's functions is clearly a matter of degree, however, with the parties differing over the extent and necessity of such improvement.

The central issue presented in these proceedings is whether the subject professional office building attached to the Genesee Hospital is entitled to the same tax-exempt status as the hospital itself pursuant to section 421 (formerly § 420) of the Real Property Tax Law. Since this proceeding to review a tax assessment is purely a matter of statutory law (Real Property Tax Law, art. 7) it is governed by the statutory provisions established by the Legislature.

Section 421 of the Real Property Tax Law provides in pertinent part as follows:

" 1. (a) Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital * * * purposes, and used exclusively for carrying out thereupon one or more such purposes either by the owning corporation or association * * * as hereinafter provided shall be exempt from taxation as provided in this section. * * *

" (d) Real property such as specified in paragraphs (a) and (b) of this subdivision shall not be exempt if any officer, member or employee of the owning corporation or association shall receive or may be lawfully entitled to receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more such purposes, or

as proper beneficaries of its strictly charitable purposes; or if the organization thereof for any such avowed purposes be a guise or pretense for directly or indirectly making any other pecuniary profit for such corporation or association or for any of its members or employees; or if it be not in good faith organized or conducted exclusively for one or more of such purposes.''.

The initial test for tax-exempt status is whether the corporation or association claiming nontaxability is '' organized exclusively '' for tax-exempt purposes (*Gospel Volunteers* v. *Village of Speculator,* 33 A D 2d 407, affd. 29 N Y 2d 622; *Matter of Faculty-Student Assn.* v. *Sharkey,* 35 A D 2d 161; *Matter of Chautauqua Inst.* v. *Town of Chautauqua,*. 35 A D 2d 1). In order to determine whether a particular corporation or association is so organized an examination of the stated purposes of the organization, as well as a view of the corporation's actual practices, is required (*Matter of Faculty-Student Assn.* v. *Sharkey, supra*). There is no dispute that the Genesee Hospital meets the first test for exemption, in that it is organized exclusively for hospital purposes, an exempt purpose pursuant to the statute.

However, the inquiry does not end there. Two further tests have been developed relating to the actual use of the realty in question before a tax exemption may properly be found. They are, (1) the organization must show that the particular parcel is '' used exclusively '' for exempt corporate purposes; and (2) if the property is not in actual use for such exempt purposes on the taxable status date (see Real Property Tax Law, § 302) by reason of the absence of suitable buildings or improvements, it shall be exempt nevertheless if petitioner can show that construction was in progress or is in good faith contemplated (*Matter of Board of Foreign Missions* v. *Board of Assessors,* 244 N. Y. 42; *Matter of Faculty-Student Assn.* v. *Sharkey, supra*).

The test of any tax exemption under the '' used exclusively '' clause of the statute is whether the particular use '' is reasonably incident '' to the major purpose of the hospital (*Matter of St. Luke's Hosp.* v. *Boyland,* 12 N Y 2d 135, 143; *People ex rel. Watchtower Bible & Tract Soc.* v. *Haring,* 8 N Y 2d 350, 358; *Matter of De Mott* v. *Notey,* 3 N Y 2d 116).

In the *St. Luke's Hospital* case (*supra*) the Court of Appeals decided in favor of the hospital's petition for a tax exemption concerning properties located across the street from the hospital which were used as apartment buildings to house hospital

personnel, chiefly doctors and nurses. It was conceded that all of the income received by the hospital for rentals was applied to the maintenance and support of the hospital. The hospital argued successfully in that case that the dwellings were necessary to place the hospital at a competitive advantage in recruiting and retaining interns, residents and nurses who were in short supply, a contention which is not unlike the one asserted by petitioner in the instant case. In the *St. Luke's* case the court however granted only a partial exemption to the hospital because not all apartments were rented to hospital personnel. To the extent that nonhospital personnel lived on the premises and paid rent to the hospital that percentage was held to be taxable.

In further explanation of the "reasonably incident" doctrine several recent cases have expounded on the criteria for adjudging whether a particular property meets the statutory standards. "The determination of whether the property is used exclusively for the statutory purposes depends upon whether its primary use is in furtherance of the permitted purposes". (*Gospel Volunteers, Inc.* v. *Village of Speculator,* 33 A D 2d 407, 411, affd. 29 N Y 2d 622; see, also, *Greater New York Corp. of Seventh Day-Adventists* v. *Town of Dover,* 29 A D 2d 861, app. dsmd. 23 N Y 2d 682.) Thus, a merely incidental use of the property for other than exempt purposes will not destroy the exemption (*People ex rel. Watchtower Bible & Tract Soc. v. Haring, supra*). However, to the extent that non-exempt uses do occur on the premises and where they cannot be said to be merely "incidental" purposes an allocation or partial exemption is mandated (*Matter of St. Luke's Hosp.* v. *Boyland,* 12 N Y 2d 135; *Matter of Chautauqua Inst.* v. *Town of Chautauqua,* 35 A D 2d 1).

The remaining focus must be upon the question of whether the use of Doctors Office Building constitutes a use reasonably incident to the furtherance of the primary corporate purpose. It has generally been held that such uses as private housing facilities (*Matter of St. Luke's Hosp.* v. *Boyland, supra*) recreational facilities (*Matter of Shrine of Our Lady* v. *Board of Assessors,* 40 A D 2d 75, affd. 33 N Y 2d 713) hospital parking lot (*Matter of Ellis Hosp.* v. *Fredette,* 27 A D 2d 390) are uses primarily in furtherance of exempt corporate purposes. Here, however, there is a commercialization and profit-making which goes well beyond the hospital's traditionally nonprofit functions. The private practice of medicine by the attending physicians in the hospital's professional office building is clearly the kind of profit-making activity intended to be excluded by the Legislature when it created the statutory exemption under section 421 of the

Real Property Tax Law. The clear distinction between the instant case and other cases dealing with commercial, corporate activity is that here we have third parties receiving pecuniary profit from their own private practice of medicine which is integrally related to the operation of the real property.

The trend of the statutory exemption law has been to restrict real property tax exemptions (*Matter of Association of Bar of City of N. Y.* v. *Lewisohn,* 34 N Y 2d 143) and the Court of Appeals has pointed out that in pursuance of this manifest intent of recent legislation tax exemptions should be construed strictly against the taxpayer.

" * * * legislatve history of section 421 of the Real Property Tax Law, as amended * * * observed that exemptions in this century have proliferated at an alarming rate * * *. Were the growth of exempt properties to continue at the rate established during the first half of this century, it was estimated that by 1985 one half of all real property on the tax rolls of local governments would be exempt from taxation * * *.

" Against this background, the Legislature enacted chapter 414 of the Laws of 1971. Its purpose was clear — to stem the erosion of municipal tax bases by permitting local governments to terminate exemptions for nonprofit organizations other than those conducted exclusively for religious, education, charitable, hospital or cemetery purposes." (*Matter of Association of Bar of City of N. Y.* v. *Lewisohn, supra,* pp. 155–156.)

In light of this expressed legislative intent a case law extension of the hospital purpose would not be warranted so as to permit an office building for the private practice of medicine to be exempt by virtue of its ownership by an exempt hospital corporation (see, also, 3 Opns. Counsel, St. Bd. of Equal. Assessm. No. 12, which rules that uses are not exempt as reasonably incident to hospital purposes).

Also the exception in paragraph (d) of subdivision 1 of section 421 for " reasonable compensation for services in effecting one or more such purposes" is not availing to the petitioner here as related to the private practice of medicine. The language concerns the matter of salaries or fees received by physicians or technicians (e.g., radiologists) for performing their services in furtherance of hospital functions. The idea of reasonable compensation for services in effecting one or more exempt purposes relates to the purpose of the hospital and not to the purely private practice of the physician. While it is argued that the hospital and the physician serve the same purpose in the community, that is, to improve the health care of

its citizens, and doubtless this is true, for purposes of a tax exemption statute this is too broad a definition in that it fails to take into account the commercial and private practice nature of the physician's operations in the subject office building. The private practice of medicine by a hospital's attending physicians is primarily a commercial enterprise only incidentally related to the hospital's function of providing health care to the community. The concept and development of a professional office building adjoining a hospital facility is an admirable addition to the community and doubtless will improve the teaching and health functions of the hospital. However, it is also a facility which is in direct competition with privately developed professional buildings in an area which serves the identical function as far as the private practice of medicine is concerned. As it presently exists the Doctors Office Building, insofar as the attending physicians are concerned, is primarily the place where they earn their living with the additional convenience of proximity to the hospital.

We hold, therefore, that where physicians lease suites from the hospital, either in the hospital or adjoining thereto, and carry on their own private practice there, such suites are not entitled to tax exemption (*Milton Hosp. & Convalescent Home* v. *Board of Assessors,* 360 Mass. 63; *White Cross Hosp. Assn.* v. *Warren,* 6 Ohio St. 2d 29).

However, with respect to the subject office building, we are not required to adopt an "all or nothing" point of view. Insofar as the property is used for, or at the taxable status date was in good faith contemplated to be used for hospital purposes, that portion of the property would be entitled to a tax exemption (Real Property Tax Law, § 421, subd. 2; *Matter of St. Luke's Hosp.* v. *Boyland,* 12 N Y 2d 135, *supra; Matter of Chautauqua Inst.* v. *Town of Chautauqua,* 35 A D 2d 1, *supra*).

There are located in the Doctors Office Building an ambulatory X-ray unit, the laboratory and research and office area for the chief of surgery, Dr. Renee Menguy, the dietary unit of the hospital and there is also planned space for an ambulatory care unit to replace the out-patient department of the hospital. This is apparently planned for the basement and first floor of the building. It would appear that the ambulatory X-ray unit is a hospital purpose notwithstanding that the radiologists obtain a percentage of the charge made directly by the hospital for X rays and billed directly by the hospital to the patients, such payments to the radiologists being directly related to services rendered by them to the hospital. The dietary unit of the hos-

pital is obviously an exempt hospital use as is the ambulatory care unit. The anticipated space for the ambulatory care unit may be granted a tax exemption notwithstanding that the improvement has not been completed and operational at tax status date (*Matter of Faculty-Student Assn.* v. *Sharkey,* 35 A D 2d 161, 166). While the above uses would clearly represent hospital purposes within the intendment of section 421 of the Real Property Tax Law, more evidence is needed before the research laboratory and office area devoted to the use of Dr. Menguy may be categorized.

In summary, the private office space leased to members admitted to staff privileges and used exclusively for the private practice of medicine in the Doctors Office Building is not exempt space and is fully taxable. The space used by the ambulatory X-ray unit, the dietary unit and the space contemplated for the ambulatory care unit are all exempt as fulfilling a primary hospital purpose. The legal status for tax purposes of Dr. Menguy's research laboratory and office cannot be determined without a more extensive exploration than is provided by the existing record as to the nature and extent of his use of the premises for private practice. The case should be remitted for such further testimony and for more evidence as to the exact nature of the plans for the ambulatory care unit and the extent of the space which it would occupy in the Doctors Office Building.

Finally, appellant's last argument concerning the alleged error of the trial court in directing relief for the tax year 1972–1973 in addition to the year 1971–1972 requested in the petition is without merit. The trial court properly recognized that respondent's request for declaratory relief at the time of trial for the latter tax years worked no prejudice upon the city since the court was essentially dealing with a question of law based upon a given set of factual proof which was the same as to both of the tax years in question. Furthermore, since appellant had, by force of law, been deemed to have denied all of the allegations in respondent's petition (Real Property Law, § 712), no prejudice can result and in fact none was established by granting the relief requested for additional tax years. The trial court acted properly and in the sound exercise of discretion in granting the motion on procedural grounds.

The judgments appealed from should be reversed and the case remitted to the trial court for further proceedings in accordance with this opinion.

MOULE, SIMONS and DEL VECCHIO, JJ., concur.

Judgment, entered December 26, 1973, unanimously reversed on the law and facts, without costs and case remitted to Trial Term for further proceedings in accordance with opinion by MARSH, P. J.

Judgment, entered December 27, 1973, unanimously reversed without costs and application denied. (See section 722 of the Real Property Tax Law.)