HAMILL, J.T.C.
In these 1992 and 1993 appeals Jersey Shore Medical Center claims that portions of Block 3000, Lot 1 in Neptune Township, which are devoted to its coffee shop and child care center, are exempt from local property taxation under N.J.S.A 54:4-3.6 as property used for hospital purposes.
According to the parties’ stipulation of facts, Jersey Shore has generally been exempt from local property taxes under N.J.S.A. 54:4-3.6. For the 1992 tax year, however, the Neptune Township tax assessor assessed the hospital coffee shop and child care center. The assessment, including a durable medical equipment store located on Jersey Shore’s premises which had previously been held taxable, totaled $473,000. The parties do not dispute the assessment of the store nor the value of the assessed properties, nor the tax status of the balance of the hospital’s property. Their dispute relates solely to whether the coffee shop and child care center are exempt.
Jersey Shore appealed the 1992 assessment to the Monmouth County Board of Taxation. The board dismissed the appeal and Jersey Shore appealed to the Tax Court. Subsequently, Jersey Shore appealed the 1993 assessment, first to the Monmouth County Board and then to the Tax Court. I heard both years on the same set of facts.
*40 The statute on which Jersey Shore relies provides in pertinent part for the exemption from local property taxation of:
[A]U buildings actually used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt ... provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the ... corporations ... using and occupying them ... are not conducted for profit____
{N.J.S.Al 54:4-8.6]
In order to succeed in its claim for tax exemption, Jersey Shore must therefore prove that: (1) it is organized exclusively for hospital purposes, (2) the buildings housing the coffee shop and child care center are used for hospital purposes, and (3) neither the hospital nor these buildings in particular are operated or used for profit. See, e.g., Long Branch City v. Monmouth Medical Ctr., 138 N.J.Super. 524, 531, 351 A.2d 756 (App.Div.1976), aff'd o.b., 73 N.J. 179, 373 A.2d 651 (1977);[1] New Brunswick v. Rutgers Community Health Plan, Inc., supra, 7 N.J.Tax at 495-96. See also Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 506, 472 A.2d 517 (1984).

I.

The parties do not dispute the fact that Jersey Shore is a nonprofit corporation organized for hospital purposes. Rather, the municipality argues that Jersey Shore’s parent corporation Modern Health Affiliates, Inc., although a nonprofit corporation, is not organized exclusively for hospital purposes because, under its corporate charter, Modern Health Affiliates may form one or more subsidiary nonprofit corporations whose purposes shall be eharita- *41 ble, scientific, and educational within the meaning of section 501(c)(3) of the Internal Revenue Code, and whose activities may- or may not be within the field of health care. Jersey Shore responds that the owner of the property for which tax exemption is sought is Jersey Shore, not its parent Modern Health Affiliates. Jersey Shore is correct. The last sentence of N.J.S.A 54:4r-3.6 requires that the entity claiming the exemption must own the property and be organized to carry out the purposes for which the exemption is claimed. Whether Modern Health Affiliates, which is not the owner of the property and which is not seeking the exemption, is organized for an exempt purpose is not relevant in determining whether the property is taxable to Jersey Shore. Evid.R. 401.
On the other hand, under N.J.S.A 54:4-2.3, exempt property that is leased to a person whose property is not exempt, may become taxable to the lessee. In order to finance construction of the child care center, Jersey Shore entered into a ground lease with Modern Health Affiliates. Modern Health Affiliates built the center and leased it back to Jersey Shore. It might be argued that under N.J.S.A 54:4r-2.3, the child care center is taxable to Modern Health Affiliates unless Modern Health itself is exempt. More plausibly, since Modem Health was interposed solely as a financing vehicle and the property is both owned and operated by Jersey Shore, N.J.S.A 54:4-2.3 would not apply even if Modem Health were not itself exempt. Cf. Hoboken v. Trustees of Stevens Inst., 11 N.J.Tax 70 (Tax 1990) (executory ground lease between exempt institute and for profit entity did not destroy exemption where institute remained the owner and continued to use the property), aff'd, 247 N.J.Super. 215, 588 A.2d 1262 (App. Div.), certif. denied, 126 N.J. 336, 598 A.2d 893 (1991).
Nor can it be plausibly maintained that Jersey Shore’s purposes are not exclusively exempt. Jersey Shore’s charter states that it is organized under the Nonprofit Corporation Law to maintain a public hospital, to establish and maintain a nursing school, and to provide “other educational, scientific, and charitable services and activities” within the scope of its other purposes. *42 Although the statute requires that an entity be organized exclusively for hospital purposes, the words should not be construed literally with the result that Jersey Shore’s ancillary purposes of operating a nursing school and providing complementary educational, scientific and charitable services destroy its exemption. “[Statutes are to be read sensibly rather than literally and the controlling legislative interest is to be presumed as ‘consonant to reason and good discretion.’ ” Schierstead v. Brigantine, 29 N.J. 220, 230, 148 A.2d 591 (1959) (citations omitted). Statutory interpretation that would lead to an absurd or unreasonable result is to be avoided. Davis v. Heil, 132 N.J.Super. 283, 293, 333 A.2d 537 (App.Div.), aff'd, 68 N.J. 423, 346 A.2d 405 (1975). Thus, although it is generally said that tax exemptions are strictly construed against the taxpayer, “[t]he basic inquiry always is the legislative intent as expressed in the statute.” Princeton Tp. v. Tenacre Found., 69 N.J.Super. 559, 563, 174 A.2d 601 (1961).
To that end the construction, while strict, must always be reasonable, and words are not to be given a rigid scholastic interpretation when it appears that they were used in another sense. The rule of strict construction must never be allowed to defeat the evident legislative design.

[Ibid.]

All of Jersey Shore’s corporate purposes fall within the various exempt purposes set forth in N.J.S.A 54:4-3.6. The underlying rationale for the exemptions is as a “quid pro quo for the performance of a service essentially public, and which the state thereby is relieved pro tanto from the necessity of performing----” Carteret Academy v. State Bd. of Taxes, 102 N.J.L. 525, 528, 133 A. 886 (Sup.Ct.1926), aff'd, 104 N.J.L. 165, 138 A. 919 (E. & A.1927). Each of the enumerated purposes in Jersey Shore’s charter relieves the State from performing a particular service. The alternative of requiring a separate nonprofit corporation to carry out each exempt purpose would be absurd and cannot have been intended by the Legislature.
Additionally, prior versions of section 3.6 support the conclusion that a hospital should not be denied tax exempt status on the basis *43 that it was organized — in addition to hospital purposes — for exempt non-hospital purposes.
Prior to 1983, the statute provided an exemption in pertinent part for:
All buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women, and children, or for religious, charitable, or hospital purposes, or for one or more such purposes____
[emphasis added]
Chapter 224 of the Laws of 1983 broke out the hospital exemption and provided that a hospital could obtain a partial exemption when part of its property was leased or used for profit making-purposes. In 1985, the statute was again amended to separate the moral and mental improvement exemption from the religious or charitable exemption and to grant moral and mental improvement entities a partial exemption similar to that provided to hospitals in 1983. L. 1985, c. 395. At that time, with no explanation, the phrase “or for one or more such purposes” was eliminated.
“When statutory law is changed by the Legislature there is a presumption against any implied repeal or amendment of the existing provisions.” General Elec. Co. v. E. Fred Sulzer and Co., 86 N.J.Super. 520, 532, 207 A.2d 346 (Law Div.1965), aff'd, 92 N.J.Super. 210, 222 A.2d 655 (App.Div.), certif. denied, 48 N.J. 350, 225 A.2d 362 (1966). In determining the Legislature’s intent in altering prior law, “it is important ... to ascertain the old law, the mischief, and the proposed remedy.” DeFazio v. Haven Sav. and Loan Ass’n, 22 N.J. 511, 518-19, 126 A.2d 639 (1956).
There is absolutely no suggestion that, when the Legislature separated the pertinent portion of N.J.S.A 54:4-3.6 into three parts, one for entities formed for moral and mental improvement purposes, another for hospital purposes, and another for religious or charitable purposes, it intended to eliminate the preexisting exemption for multipurpose entities. The sole purpose of the 1985 amendment to N.J.S.A 54:4-3.6 was to permit a partial exemption for entities organized for moral and mental improvement purposes. As the intent of the Legislature in 1983 and 1985 was to *44 make it easier to qualify for the hospital and moral and mental improvement exemptions, it would defy common sense to conclude that, with no explanation, the Legislature simultaneously intended to make it more difficult to qualify by limiting the exemption to single purpose entities. See Jersey City Chapter of the Prop. Owner’s Protective Ass’n v. City Council, 55 N.J. 86, 100, 259 A.2d 698 (1969) (statutory construction will not turn on “literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the eommonsense of the situation”).
For the relevant period, Jersey Shore was organized exclusively for exempt purposes.[2]

II.

The remaining questions are whether the coffee shop and child care center are used for hospital purposes and whether Jersey Shore or the buildings at issue are operated or used for profit.
A
The coffee shop is located in the hospital. It is open to hospital visitors and hospital staff. It is not used by the general public unless they have some other reason to be at the hospital, and *45 there is no exterior sign advertising the existence of the coffee shop. There are several nearby eateries, including a delicatessen and pizzeria across the street and a Dunkin Doughnuts and McDonald’s within a mile.
During 1992 the coffee shop was operated by PCS Management Corp. under a management agreement with the hospital. PCS is a for-profit corporation. The coffee shop is open from 6:00 a.m. to 12 midnight seven days a week. PCS receives an overhead fee equal to 8% of gross revenues. Excess revenues over expenses are shared, with the hospital receiving 60%, PCS receiving 40%, and the hospital providing 10% of its share of the revenues as a bonus for the coffee shop manager. Profit and loss statements were not provided, but the parties stipulated that for 1992, due to the 8% overhead charge and repairs, the hospital did not have a net profit from the operation of the coffee shop.
Prices at the coffee shop are comparable to prices charged at similar nearby coffee shops, but hospital employees are provided a discount of between 10-15%. The coffee shop menu is subject to the hospital’s approval. Any changes in the menu or prices of the coffee shop must be approved by the hospital.
PCS employs the individuals working in the coffee shop and has full responsibility for the terms and conditions of their employment. Liability and property insurance for the coffee shop area are the responsibility of PCS.
The hospital funded the purchases of equipment for the coffee shop and retains title to it. PCS is prohibited from altering or improving the coffee shop area without prior consent of the hospital.
There is also a hospital cafeteria operated by hospital employees. The cafeteria provides food for hospital patients. Approximately 70% of the 2500 hospital employees eat in the cafeteria; the remaining 30%, plus doctors and other nonemployee hospital staff, eat in the coffee shop. The cafeteria charges lower prices than the coffee shop. At times, hospital employees are forced to eat in the coffee shop because the cafeteria is open on a more *46 limited basis and because the employees are allowed only half an hour for breaks, which makes it difficult for them to eat anywhere other than on the hospital’s grounds.
As both parties point out, the accepted test in New Jersey for determining whether property is used in the work of an entity organized for an exempt purpose is whether the property is “reasonably necessary” for such purpose. Long Branch City v. Monmouth Medical Ctr., supra, 138 N.J.Super. at 532, 351 A.2d 756; Princeton Tp. v. Tenacre Found., supra, 69 N.J.Super. at 565, 174 A.2d 601. Jersey Shore maintains that the coffee shop is reasonably necessary to the functioning of the hospital and that exemption should not be denied on the ground that the coffee shop is operated under a management agreement with an independent for-profit corporation. The township counters that, since the coffee shop is operated by a for-profit entity, it is not exempt.
In Long Branch City v. Monmouth Medical Center, supra, the Appellate Division considered the question of whether various buildings owned by a hospital were exempt from local property tax. These included apartments used exclusively as residences for resident doctors, interns, and nurses on the staff of the hospital and a wing devoted half to hospital departments and administration and half to doctors’ offices in which the doctors conducted their private practices. The rentals charged the doctors were less than those for comparable office space in the area, and the wing operated at a loss. A third building was partially leased to a community college for its nurses’ training program and partially leased to doctors and a dentist for their private practices. Most of the doctors and the dentist renting space in both buildings had some affiliation with the hospital. A fourth building was leased to a retail pharmacy, which granted a discount on drug purchases to certain patients.
The Appellate Division held that the apartments for resident doctors, interns and nurses on the hospital staff were reasonably necessary for the operation of the hospital. The below market rentals served as a subsidy to attract qualified individuals to the hospital’s staff. The nearby location of the apartments enabled *47 the hospital to operate more efficiently on a 24-hour basis. Thus, the landlord-tenant relationship was secondary to the primary purpose of providing housing for necessary personnel. Long Branch City, supra, 138 N.J.Super. at 532-33, 351 A.2d 756. As to the remaining buildings, however, the court concluded that none was used exclusively for hospital purposes. The doctors’ and dentist’s offices were used for the private practice of medicine, a private profit-making activity that competed directly with other office space in the area. Because the landlord-tenant relationship was commercial in nature, the fact that the hospital operated the buildings at a loss did not convert the use to a hospital use. Nor could the hospital succeed on the theory that its operations were made more efficient by the close proximity of the doctors’ and dentist’s offices. In the court’s words:
Convenience is not the test; the test is reasonable necessity for hospital purposes, and the use of these buildings for private professional offices is not reasonably necessary for the Center’s hospital purposes.
[Id. at 535, 351 A2d 756]
Reasoning from Genesee Hospital v. Wagner, 47 A.D.2d 37, 364 N.Y.S.2d 934 (1975), the court distinguished the lease of space for doctors’ private medical practices from residential leases for hospital staff and hospital parking lots on the ground that the office leases involved “‘third parties receiving pecuniary profit from their own practice of medicine____’” Long Branch City, supra, 138 N.J.Super. at 537, 351 A.2d 756 (quoting Genesee Hosp. v. Wagner, supra, 364 N.Y.S.2d at 942). For similar reasons, the Appellate Division concluded that the building leased in part to a retail pharmacy was not used for hospital purposes. Id. at 538, 351 A.2d 756.
In determining whether faculty residences located on a day school’s campus were exempt, the Supreme Court stated in Pingry Corp. v. Hillside Township, 46 N.J. 457, 463, 217 A.2d 868 (1966), that a finding of tax exemption must be based on a number of factors including, in that case, the “absence of a profit-making arrangement in the rental contract.” The Court continued:
*48 Where the institution by its rental agreements with its faculty members assumes the role of an ordinary landlord and profits, the purpose to which the buildings are put can be said to only indirectly further the goals of the school and thus the finding of “actual use” cannot be found. However, where, as here, the landlord-tenant relationship is secondary to the primary purpose of providing the housing for the faculty on the campus site and no profit is possible, an exemption can be justified.

[Ibid.]

The Court employed a similar rationale in Princeton University Press v. Princeton Borough, 35 N.J. 209, 216, 172 A.2d 420 (1961), in concluding that the press was not exempt. To the extent the press engaged in printing for outside nonprofit organizations to offset the losses incurred in the publication of scholarly works, its purpose was to make a profit. As a part of the operation was commercial in nature, the property was not used exclusively for an exempt purpose. Use of the profits to fund the publication of scholarly works was not in and of itself an exempt use of the property. See also Ironbound Educ. & Cultural Ctr., Inc. v. Newark, 8 N.J.Tax 540 (Tax 1986), aff'd, 220 N.J.Super. 346, 532 A.2d 258 (App.Div.1987) (charitable organization’s property not exempt where 35% of premises was leased to a commercial restaurant even though rental income was used to renovate the charity’s property), certif. denied, 110 N.J. 200, 540 A.2d 192 (1988).
Here, the management agreement between Jersey Shore and PCS reflects a profit-making purpose. The 60-40 profit split makes clear that both parties contemplate making a profit, and there is nothing in the other terms of the agreement to suggest that a profit is impossible. The use of the property is thus commercial in nature and not exempt.
The fact that, during the years at issue, Jersey Shore may not have realized a profit from the coffee shop operation does not change the fundamentally commercial nature of the coffee shop use. Long Branch City, supra, 138 N.J.Super. at 535, 351 A.2d 756. The question is whether the coffee shop is operated for hospital purposes or whether it is operated for the purpose of *49 making a profit. While competitive prices and actual profits or losses may constitute evidence of a particular purpose, they are not conclusive. In Paper Mill Playhouse v. Millburn Tp., supra, the Court concluded that Paper Mill’s profit in one year out of four did not destroy its exemption. 95 N.J. at 521-22, 472 A.2d 517. On the other hand, as made clear in the Long Branch City case, operation of a hospital rental property at a loss does not ensure an exemption. 138 N.J.Super. at 535, 351 A.2d 756. The decisive fact in this case is the profit-making purpose as evidenced by the sharing of any pecuniary profits between the hospital and the coffee shop operator. Operating a coffee shop to make a profit is not an exempt use of the property. See Princeton University Press v. Princeton Borough, supra, 35 N.J. at 216, 172 A 2d 420.
Coneededly, other aspects of the arrangement do further the hospital’s purposes. These include the coffee shop’s long daily hours of operation, use by 30% of the hospital’s employees at a 10-15% discount, and the need for a restaurant on the hospital premises for relatives of critically ill patients. But the same could be said of the doctors’ offices in Long Branch City. The proximity of the offices to the hospital undoubtedly furthered the hospital’s purposes. The Appellate Division concluded, however, that the private practice of medicine was a profit-making activity and that the hospital’s leasing operation competed with commercial office buildings. Long Branch City, supra, 138 N.J.Super. at 535, 351 A.2d 756. Similarly here, the operation of a coffee shop for profit is a commercial activity that competes with nearby eateries. It is not apparent why the taxpayers of Neptune Township should subsidize the operations of a coffee shop that is being operated to make a profit.
Jersey Shore maintains that the coffee shop is similar in nature to the hospital parking garage found to be exempt in Overlook Hosp. Ass’n v. Summit, 6 N.J.Tax 90 (Tax 1983), aff'd per curiam, 6 N.J.Tax 350 (App.Div.1984). The hospital garage in question was located close to the hospital and was used by hospital employees, patients, visitors, and others. The garage was managed by *50 Summit Parking Corporation, an independent contractor. While the precise terms of the management agreement are unclear, it appears that the parking garage receipts were paid over to the hospital. The hospital paid the garage operator’s expenses plus a monthly management fee. Any excess income would have been retained by the hospital, but in the short period during which the garage had been in operation, it had run at a loss. A portion of the loss was due to the fact that over a third of the parking spaces were used by hospital personnel without charge.
The financial arrangement between Overlook Hospital and Summit Parking did not establish a profit-making purpose. Unlike Jersey Shore’s coffee shop operator, Summit Parking’s profit was limited to a fixed management fee, and the hospital bore the costs of the garage. Structurally, the fee was no different than compensation paid to hospital employees to operate a hospital garage. PCS and Jersey Shore, on the other hand, are both able to net a profit to the extent PCS keeps its prices current and its costs in line. Additionally, since the Overlook garage was free to hospital employees, who used more than one third of the parking spaces, it was virtually impossible for the garage to show a profit. The situation is quite unlike the small discount for hospital employees at Jersey Shore’s coffee shop. Finally, to the extent that the parking garage expenses and Summit’s monthly management fee exceeded receipts from the garage operation, Overlook Hospital apparently was obligated to pick up the difference. Jersey Shore, on the other hand, has no obligation to make up a shortfall in the coffee shop’s revenues. In short, overlook Hospital’s parking garage operation was not structured to make a profit, either for the hospital or the parking garage.
Overlook’s relationship with Summit Parking was much like the relationship between Blair Academy and the outside catering firm that was used to feed the school’s students and faculty. See Blair Academy v. Blairstown, 95 N.J.Super. 583, 590, 232 A.2d 178 (App.Div.), certif. denied, 50 N.J. 293, 234 A.2d 401 (1967). Rather than staff the kitchen and dining room with its own employees, the school found it expedient to hire an outside caterer, who was *51 paid a fixed fee per person. The Appellate Division sustained the exemption. The kind of contractual arrangement in Blair Academy and Overlook Hosp. Ass’n involving payment of a fixed management fee to a third party provider is quite different from the profit-sharing arrangement between Jersey Shore and its coffee shop operator.
Jersey Shore’s reliance on New Brunswick v. Rutgers Community Health Plan, Inc., supra, is misplaced. The issue in that case was whether a health maintenance organization could qualify as an exempt hospital. The court held that it could not because the HMO’s services were not “performed for the purpose of advancing the aims and goals of a functioning hospital” even though its functions were similar in nature to at least some of the services offered by a hospital. 7 N.J.Tax at 505-07. Jersey Shore suggests that the decision stands for the proposition that various services, such as laundry, accounting, parking, and residential housing for hospital personnel, may be reasonably necessary to a hospital purpose if associated with a functioning hospital and that a coffee shop operating on hospital premises falls into the same category. While that may be true, the argument does not address the problem here of the profit-making nature of the coffee shop operation. Under a different contractual arrangement, a hospital coffee shop, might well be exempt. Here, the profit-making purpose of the arrangement precludes an exemption.
During the relevant period, Jersey Shore’s coffee shop was not reasonably necessary for hospital purposes.
This holding is not contrary to Paper Mill Playhouse v. Millburn Tp., supra. In that case our Supreme Court noted that “[i]n cases where we have held that the taxpayer was operating for a profit, the profit arose from the nonexempt operation of the organization.” 95 N.J. at 523, 472 A.2d 517. The Court found that Paper Mill was not a commercial enterprise and that any profits the entity realized were the result of the exempt operation of the organization. Here, to the contrary, in light of the profit-sharing agreement, any profits realized by Jersey Shore from the *52 coffee shop would be the result of “the nonexempt operation of the organization.”
Since the coffee shop was not reasonably necessary for the accomplishment of the hospital’s purposes, it is unnecessary to consider the third test — whether Jersey Shore and the coffee shop were operated on a nonprofit basis. It may be worth noting, however, that, if the coffee shop were deemed reasonably necessary for hospital purposes, it would clearly fail the third test. Under that test, to be exempt, the coffee shop must not be conducted for profit. N.J.S.A 54:3-6. The operating agreement between Jersey Shore and PCS plainly establishes that the coffee shop was conducted for profit since the agreement contemplates a 60-40 sharing of profits. In view of the profit-sharing arrangement and the charging of competitive prices, it is impossible to conclude that the shop was not being operated for profit. Thus, even assuming that the shop was operated to further the hospital’s purposes, that fact would not carry the day under the third test.
Any other conclusion would create an artificial distinction between leases of hospital property to “profit-making organizations,” which are clearly taxable under the 1983 statutory amendment (see supra at 54 and 57) and operating agreements permitting the use of hospital property by profit-making organizations. Whether use of the real estate is by way of a lease or an operating agreement should not affect the taxability of a use by a profit-making entity.
Jersey Shore’s coffee shop is not exempt from local property taxes for the 1992 and 1993 tax years.

B.

The child care center was established in 1989 after a study suggested that there were few child care centers in close proximity to the hospital and no nearby centers that provided care to infants as young as eight weeks. The center provides care to such infants as well as to toddlers, pre-school children, and children up to 12 on an after-school basis. In addition, the center has a separate room, staffed by a registered nurse, for mildly ill chil *53 dren. The center is located on the hospital grounds in a single story eight-room building with a large playground attached. The building is used exclusively for child care purposes.
When the center opened in 1989, it was licensed for 100 children, 10 of whom could be the children of non-hospital employees. That policy was changed in 1991; attendance is now limited to children of hospital employees although three children of non-hospital employees are “grandfathered” under the prior policy. Currently, the center is licensed for 160 children. Enrollment far exceeds that number because the children attend at different times. There is a long waiting list.
The center is open from 6:80 a.m. to 8:00 p.m., Monday through Friday. It is staffed by the hospital; there is no outside provider. Rates range from $120 per week for infants to $95 per week for children three years and older. Children of non-hospital employees pay approximately $10 more per week. Other nearby child care centers charge between $130-$145 for infant care but approximately the same or slightly less than Jersey Shore for older children. Since its opening in 1989, Jersey Shore’s center has operated at a loss of between $100,000 to $200,000 annually, $100,000 of which consists of “rent” payable by Jersey Shore to Modern Health affiliates under a lease entered into as part of the financing of the child care center building.
In preparation for the hearing, the Neptune Township assessor performed a survey and concluded that there are six nearby day care centers. The closest of these is located within three blocks of the hospital. The other five are located within one to five miles of the hospital. The rates at these facilities appear to be comparable to or slightly lower than Jersey Shore’s. With the exception of the Country Child Care Center, located 2/é to 3 miles from the hospital, which accepts infants aged 12 weeks or older, none of the other centers accepts children younger than one year and four of the six take children at or older. The hours of operation of the nearby centers are generally 7:00 a.m. to 5:30 or 6:00 p.m.
The question of whether the child care center is used for the hospital’s purposes comes down to whether the center is reason *54 ably necessary for carrying out the hospital’s purposes or is simply a convenience for the hospital and its employees. The Long Branch City case again provides guidance. There, the Appellate Division concluded that apartments located a block and a half from the hospital and used exclusively as residences for resident doctors, interns, and nurses on the staff of the hospital were reasonably necessary for the operation of the hospital. The nearby residences enabled the hospital to function more efficiently on a 24-hour basis. The below market rentals helped the hospital attract qualified staff. Long Branch City, supra, 138 N.J.Super. at 533, 351 A.2d 756. On the other hand, offices leased to doctors for their private practices were not reasonably necessary for hospital purposes. Having the doctors nearby was convenient for the hospital, but convenience did not equate with reasonable necessity.
The essence of a hospital is 24-hour continuous medical and nursing care. New Brunswick v. Rutgers Community Health Plan, Inc., supra, 7 N.J.Tax at 502-04; Intercare Health Systems, Inc. v. Cedar Grove Tp., 11 N.J.Tax 423, 429 (Tax 1990), aff'd, 12 N.J.Tax 273 (App.Div.1991), certif. denied, 127 N.J. 558, 606 A.2d 369 (1992). Jersey Shore’s child care center furthers that essential function. The center is located on the hospital premises making it possible for the hospital staff, whose children are in the center to work the 12-hour hospital shifts without the interruption of dropping off and picking up their children at other locations. The center’s long hours of operation — 6:30 a.m. to 8:00 p.m. — further serve the need of the hospital to operate on a 24-hour basis with 12-hour shifts.
The hospital administrator in charge of the child care center testified that, while the center may not attract qualified staff, it definitely helps retain them. Eighty-five percent of the hospital’s employees are women. The presence of the child care center on the hospital’s premises and its policy of admitting infants as young as eight weeks have meant that parents of extremely young children have been able to continue working at the hospital. Additionally, the existence of the mildly ill room permits primary *55 caregivers to continue working even though a child may have a cold or other mild illness. According to the testimony of the hospital administrator, the center has significantly reduced absenteeism among hospital employees.
The combination of these factors — limitation of enrollment to children of hospital employees, location on the hospital premises, lengthy hours of operation, willingness to admit infants as young as eight weeks, and existence of mildly ill room — establish that the child care center exists to further the hospital’s staffing needs and its 24-hour continuous care operation. The presence of three children of non-hospital employees on a grandfathered basis out of approximately 250 enrolled children is de minimis and does not indicate a use for non-hospital purposes. See Boys’ Club of Clifton, Inc. v. Jefferson Township, 72 N.J. 389, 400, 371 A.2d 22, (1977).
Contrary to the township’s position at trial, it does not matter that Jersey Shore’s child care center and child care centers run by for-profit corporations provide a similar benefit to the employees whose children are cared for. When operated on a nonprofit basis and primarily to serve the purposes of a hospital, a child care center that might be taxable if operated by a for-profit corporation may become exempt as reasonably necessary for the operation of the hospital. The same is true of laundry services, accounting services, residential facilities for essential staff, and parking garages. If operated in conjunction with a functioning hospital, all these services may become exempt uses. See New Brunswick v. Rutgers Community Health Plan Inc., supra, 7 N.J.Tax at 506.
Whereas the profit-sharing agreement between Jersey Shore and PCS supports a finding that the coffee shop was operated for profit, no profit-making purpose can convincingly be attributed to the child care center. Just as “residents and interns increasingly now are married persons rather then [sic ] single persons,” Perth Amboy Gen. Hosp. v. Perth Amboy, 176 N.J.Super. 307, 311, 422 A.2d 1331 (App.Div.1980) (justifying an exemption for residential condominiums located one and a half miles from a hospital), *56 women with young children increasingly work. Thus, depending on the facts, providing convenient child care may be deemed reasonably necessary for the efficient 24-hour operation of a hospital.
Based on the combination of factors discussed above, Jersey Shore’s child care center is reasonably necessary to carrying out Jersey Shore’s hospital purposes.
The final question is whether Jersey Shore and the building housing the child care center are operated or used for profit. There is no dispute that Jersey Shore is operated on a nonprofit basis. As to the building housing the child care center, the evidence at trial indicated that there are several nearby competing child care centers. With the exception of the rate for infant care, the rates charged by Jersey Shore at its child care center are approximately comparable to, or somewhat higher than, rates charged at these nearby centers. This may be due to the fact that the hours of operation at Jersey Shore’s center are approximately 20% longer than those at the competing centers, and employing a registered nurse to care for mildly ill children presumably is more expensive. Nevertheless, Jersey Shore’s child care center operates at a substantial loss of between $100,000 to $200,000 annually. Although $100,000 of that loss is attributable to the payment of rent to Modern Health Affiliates to retire the loan incurred to finance construction of the child care building, the loss in recent years has substantially exceeded that amount. Under these facts, it cannot be concluded that the building is being operated for profit. In fact, the child care center has never cleared a profit since it commenced operations in 1989. Cf. Paper Mill Playhouse v. Millburn Tp., supra, 95 N.J. at 527, 472 A.2d 517 (Clifford, J., dissenting). Even if the child care center did manage to make a profit, this would not mean that the center was being “conducted for profit,” in violation of section 3.6 (emphasis added). Rather, it would simply mean that an exempt activity had realized a surplus. Cf. id. at 523, 472 A.2d 517.
*57 As the child care center is reasonably necessary for hospital purposes and is not operated for profit, the center is exempt from local property taxes for the 1992 and 1993 tax years.
In conclusion, Jersey Shore’s coffee shop is taxable for the 1992 and 1993 tax years, while its child care center is exempt. The assessment of the Neptune Township assessor is thus sustained as to the coffee shop and reversed as to the child care center. As I was not provided with a breakdown of the $473,000 assessment to reflect individual amounts for the durable equipment medical store, coffee shop, and child care center, the assessor is directed to provide figures for the store and coffee shop so that judgments may be entered for the two tax years.

 Subsequent to the decision in the Monmouth Medical Ctr. case, the exemption provision was amended by L. 1983, c. 224 to eliminate the requirement that hospital property be used exclusively for hospital purposes and to permit a partial exemption for the portion of the properly so used. New Brunswick v. Rutgers Community Health Plan, Inc., 7 N.J.Tax 491, 495 n. 1. (Tax 1985). There is thus no issue in this case as to the exemption of the hospital in general even if a portion of the hospital building is determined to be taxable.

 In Planned Parenthood v. Hackensack, 12 N.J.Tax 598 (Tax 1992), aff'd per curiam, 14 N.J.Tax 171 (App.Div.1993), Judge Small held that Planned Parenthood was organized and its premises were used exclusively for the moral and mental improvement of men, women and children. This was so despite the fact that Planned Parenthood was partially organized and its property was used partially for charitable purposes. Under the particular facts presented, the charitable purpose and use were subsumed under the moral and mental improvement category. In its per curiam affirmance the Appellate Division declined to express an opinion as to whether a moral and mental improvement organization or a charitable organization “must use [its] property solely for the purpose for which [it] has been organized.” 14 N.J.Tax at 172. Since the Appellate Division has not adopted the Tax Court’s reasoning requiring a union of single purpose and use, this opinion has taken a somewhat different approach. With either approach, the result is the same. A multipurpose organization," all of whose purposes fall under one or another of the exempt purposes described in NJ.S.A. 54:4-3.6, meets the organizational test.